**Shirley DAVIS, Plaintiff-Appellant,**

v.

**Otto E. PASSMAN, Congressman of the United States, Defendant-Appellee.**

No. 75–1691.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1977.

Stephen J. Katz, Monroe, La., George M. Strickler, Jr., New Orleans, La., for plaintiff-appellant.

Jesse D. McDonald, Monroe, La., for defendant-appellee.

Before BROWN, Chief Judge, and JONES and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case a member of the United States Congress unflinchingly asserts that the Constitution allows him openly to discriminate against women. He asserts further that he need not so much as suggest a single basis for the discrimination. The issue is not to be trivialized. We have here a conflict of transcendental importance between the rights of the individual and the rights of a representative qua representative. Although representatives admittedly have some insulation not wrapped around ordinary mortals, the conflicting interests must be harmonized, not dichotomized. Finding that our Constitution protects individual rights even against the mighty, we remand this case for trial.

In the early part of 1974 Shirley Davis was Deputy Administrative Assistant to Representative Otto E. Passman of the Louisiana Fifth Congressional District. The Representative terminated Davis's employment effective July 31, 1974. In his letter to her explaining the termination decision the Representative wrote, "You are able, energetic and a very hard worker. . . . [H]owever, on account of the unusually heavy workload in my Washington office, and the diversity of the job, I concluded that it was essential that the understudy to my administrative assistant be a man." The full text of this rather remarkable letter is set out in the margin.[1]

1. Dear Mrs. Davis:

My Washington staff joins me in saying that we miss you very much. But, in all probability, inwardly they all agree that I was doing you an injustice by asking you to assume a responsibility that was so trying and so hard that it would have taken all of the pleasure out of your work. I must be completely fair with you, so please note the following:

You are able, energetic and a very hard worker. Certainly you command the respect of those with whom you work; however, on

Davis then filed this action against the Representative, claiming he had violated the equal protection component of the fifth amendment's due process clause. She invoked the court's "arising under" jurisdiction pursuant to 28 U.S.C. § 1331(a), and she sought specific relief, damages and declaratory relief.

The Representative moved to dismiss the complaint on three grounds: that his conduct was not unconstitutional, that the law afforded Davis no private right of action, and that the doctrines of sovereign and official immunity barred the action. The district court rejected the immunity argument but dismissed the action on the first two points. We reverse, finding that Davis's allegations, if proved, will establish a constitutional violation for which she has a private right of action. We agree with the district court that the immunity doctrines do not bar the suit.

I.  Constitutionality

█ Although the fourteenth amendment's equal protection clause applies only to the states, the fifth amendment's due process clause contains an equal protection component applicable to the federal government. *See, e. g., Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *N. L. R. B. v. Sumpter Plywood Corp.,* 535 F.2d 917, 930 n.22 (5th Cir. 1976). Moreover, recent Supreme Court decisions establish beyond dispute that, just as sex discrimination by the states violates the fourteenth amendment unless supported by suf-

ficient justifications, *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), sex discrimination by the federal government violates the fifth amendment. *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). We must therefore address two questions: whether the alleged conduct constituted sex discrimination, and if so whether sufficient governmental interests validate the discrimination.

A.  *Discrimination*

█ In the case at bar the first question is easily answered. Davis's allegations, which must of course be taken as true in evaluating the Representative's motion to dismiss, *see, e. g., Radovich v. National Football League,* 352 U.S. 445, 448, 77 S.Ct. 390, 1 L.Ed.2d 456 (1956); *Reeves v. City of Jackson, Mississippi,* 532 F.2d 491, 493 (5th Cir. 1976), clearly make out a case of sex discrimination. The Representative's termination letter offered but a single reason for Davis's dismissal: she was a woman; the job called for a man.

The Representative argues, however, that unconstitutional sex discrimination occurs only when the sex-based classification is embodied in a statute and only when the actor is someone other than a member of Congress. With respect to the first point he correctly notes that the statute upon which his dismissal of Davis was predicated,

account of the unusually heavy work load in my Washington Office, and the diversity of the job, I concluded that it was essential that the understudy to my Administrative Assistant be a man. I believe you will agree with this conclusion.

It would be unfair to you for me to ask you to waste your talent and experience in my Monroe office because of the low salary that is available because of a junior position. Therefore, and so that your experience and talent may be used to advantage in some organization in need of an extremely capable secretary, I desire that you be continued on the payroll at your present salary through July 31, 1974. This arrangement gives you your full year's vacation of one month, plus one additional month. May I fur-

ther say that the work load in the Monroe office is very limited, and since you would come in as a junior member of the staff at such a low salary, it would actually be an offense to you.

I know that secretaries with your ability are very much in demand in Monroe. If an additional letter of recommendation from me would be advantageous to you, do not hesitate to let me know. Again, assuring you that my Washington staff and your humble Congressman feel that the contribution you made to our Washington office has helped all of us.

With best wishes,

Sincerely,

/s/ Otto E. Passman

Member of Congress

2 U.S.C. § 92, is nondiscriminatory on its face; it allows dismissal of both male and female staff members with or without cause. The Representative also correctly notes that neither *Frontiero* nor *Wiesenfeld* compel rejection of his position; both of those cased invalidated *statutory* classifications.[2]

■ The Representative's argument that equal protection principles apply only to statutory discrimination, however, contravenes a long and unbroken chain of decisions. The Supreme Court clearly rejected the argument as long ago as 1886. In *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) the Court held that the discriminatory application against Chinese Americans of facially neutral building regulations violated the equal protection clause. The passage of time has enhanced, not diminished, the position of *Yick Wo* as a pillar of our jurisprudence. Numerous more recent decisions have struck down nonstatutory discriminations, usually without even pausing to note explicitly that equal protection principles are not limited to statutes. *See, e. g., Keyes v. School District No. 1*, 413 U.S. 189, 201, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974); *United Farmworkers*

*of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799 (5th Cir. 1974).

Equal protection scrutiny of inconsistencies in the application of facially nondiscriminatory statutes is not, of course, without limits. In *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed.2d 497 (1944) a state elections official refused to follow a state law requiring that a successful primary candidate be certified for inclusion on the general election ballot. The Court rejected the candidate's argument that this isolated failure to apply the state law to everyone equally constituted a denial of "equal protection of the laws." The Court laid down the governing standard:

The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who [were] entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden v. Hughes*, supra, 321 U.S. at 8, 64 S.Ct. at 401.

Davis's complaint clearly meets the *Snowden* requirements. The only digressions from neutral statutory provisions that *Snowden* exempts from equal protection scrutiny are those isolated incidents not based on a *classification*.[3] Here Represent-

---

**2.** *Frontiero* confronted a statutory scheme dealing with benefits afforded members of the uniformed services for their "dependent" spouses. A serviceman could claim his wife as a dependent without regard to actual dependency, whereas a servicewoman could claim her husband only if he was shown to be dependent upon her for over one-half of his support. The court invalidated the scheme. Similarly, *Wiesenfeld* struck down a provision of the Social Security Act that granted a widow, but not a widower, benefits based on the deceased spouse's earnings.

Supreme Court decisions invalidating state sex discriminations have also involved statutes. *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) held unconstitutional an Idaho statute under which male candidates to administer an estate were preferred over equally-qualified female candidates. *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) struck down a Utah statute that established a greater age of majority for males than for females.

**3.** *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) supports this analysis. There the Supreme Court upheld the District of Columbia Metropolitan Police Department's use of Test 21 to screen applicants. The test allegedly excluded a disproportionate number of black applicants and would therefore have been invalid under Title VII and *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). But the action had been brought before Title VII was made applicable to the federal government in 1972, and the Constitution itself provided the governing standard. See 426 U.S. at 238, n. 10, 96 S.Ct. 2040.

Unlike the situation in *Snowden*, the challenged action in *Washington* did reflect a classification; applicants were separated into one group that passed the test and another that did not. Equal protection scrutiny was therefore appropriate. Because the Court found no racially discriminating purpose, an issue as to which racially disproportionate impact was relevant but not dispositive, it did not invoke the

ative Passman established a classification; he divided potential deputy administrative assistants into one group of men and another of women. The termination letter, at least on its face, is an open declaration of "intentional" and "purposeful" sex discrimination.

Therefore, Representative Passman will be free at trial to demonstrate that the firing was not in fact based upon Davis's gender, but he can derive no support from the nonstatutory nature of the discrimination. The constitutional guarantee of freedom from invidious discrimination would ring hollow indeed if it could be bypassed by the simple expedient of implementing the discrimination under a facially neutral statute. That the alleged discrimination was not embodied in a statute is of no moment.[4]

Representative Passman's contention that the constitutional ban on unjustified sex discrimination does not restrict the actions of members of Congress is equally untenable. He argues, in effect, that his congressional status endows him with an open-ended right to discriminate irrespective of the time, place and condition of the discrimination.[5] A representative, however, is as subject to constitutional standards when hiring employees as when acting in concert with other members of Congress to enact legislation. A representative is not an imperator and is never above and beyond the law; any other view could not be squared with the whole predicate upon which our constitutional life depends. The need for wide discretion in staff employment decisions cannot be ignored, but the constitutional proscription of blatant sex discrimination does not impair Representative Passman's legitimate control over his staff to any extent at all. The Constitution does not force him to hire by the slide rule, but at the same time it does not permit him to slide into unbridled discrimination. The geometry of congressional discretion in hiring and firing is neither apogean nor perigean. We must equilibrate. Representative Passman can certainly assemble a capable and competent staff without engaging in the sex discrimination alleged here. The applicable constitutional standards may give a representative greater leeway in employment decisions than other government entities possess, and at trial Representative Passman may be able to show that he has not transgressed the constitutional requirements. All we need decide for purposes of this appeal, however, is that at some point invidious discrimination by a representative in his or her employment decisions is unconstitutional. Davis's allegations are certainly sufficient to entitle her to go to trial in an effort to show that this is such a case.[6]

stringent equal protection scrutiny that attends racial classifications. The Court upheld the challenged classification, finding it sufficiently related to the legitimate goal of modestly upgrading the communicative abilities of government employees. 426 U.S. at 245–246, 96 S.Ct. at 2050, 48 L.Ed.2d at 610.

4. Although *Yick Wo* and the other cited decisions were decided under the fourteenth amendment, the equal protection component of fifth amendment due process contains the same principle. There is no reason to exempt the federal government from the principle that discriminatory applications of nondiscriminatory statutes must meet equal protection guidelines, as *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) implicitly recognized. *See* note 3 *supra.*

5. Whether the courts can redress a representative's transgressions of the constitutional standards presents a separate issue. Representa-

tive Passman asserts not only that he is immune from suit, but also that even apart from the possibility of redress, the Constitution does not prohibit him from discriminating on the basis of gender.

6. To eliminate any confusion we note that appellant need not demonstrate the denial of any "property" interest. Although the due process clause extends only to deprivations of "life, liberty, or property", a violation of the clause's equal protection component is necessarily a deprivation of "liberty". Therefore, decisions under the due process clause's equal protection component, like substantive due process decisions, make no reference to the "life, liberty, or property" requirement. *See, e. g., Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

### B. Justification

The next issue is whether the alleged discrimination is constitutional because supported by sufficient governmental interests. Whether the interests supporting a sex discrimination must be "compelling" is unsettled. In *Frontiero* four justices said sex was a "suspect classification" calling for strict judicial scrutiny. *See* 411 U.S. at 682–88, 93 S.Ct. 1764 (plurality opinion by Brennan, J.). Under that approach the government must show a compelling interest. Three justices, however, reserved the "strict scrutiny" issue saying the classification there was unconstitutional in any event. 411 U.S. at 691–92, 93 S.Ct. 1764 (Powell, J., concurring). The earlier case of *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and the subsequent cases of *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) and *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), invalidated sex discriminations without addressing the strict scrutiny issue.[7] In these decisions the Court clearly applied more than the minimal rationality test that characterizes equal protection decisions in some other areas, however, and sex-based classifications must withstand at least middle-level equal protection scrutiny.[8]

In the case at bar we can follow the Supreme Court's lead and refrain from specifying the applicable standard. Indeed, we need not even apply the substantial scrutiny that has characterized the Court's decisions. For here Representative Passman offers no governmental interest at all in support of the sex-based classification, and we can imagine none.[9] The qualifications for the post of deputy administrative assistant simply have nothing to do with gender. The Representative's suggestion in his letter that the job requires a man because of the "unusually heavy work load" and the "diversity of the job" is patently ridiculous. Understandably, the Representative has abandoned that rationale on this appeal. The Representative will be free at trial to pursue his contention that gender was not the basis of Davis's dismissal, but if he is unsuccessful the firing cannot escape constitutional condemnation.

### II. Availability of Relief

Having determined that Davis has alleged a constitutional violation, we must now determine whether the claim is one upon which relief can be granted. In substance, Davis seeks three forms of relief: specific relief, damages, and a declaration. We deal with each in turn.

### A. Specific Relief

The specific relief Davis seeks includes reinstatement, promotion and an injunction against unlawful discrimination directed toward her. The injunction claim might raise a sovereign immunity issue under our decisions in *Blaze v. Moon*, 440 F.2d 1348 (5th Cir. 1971) and *Beale v. Blount*, 461 F.2d 1133 (5th Cir. 1973), even though the Supreme Court has said in *Larson v. Domestic*

---

**7.** The holdings of *Reed, Wiesenfeld* and *Stanton* are outlined in note 2 *supra*. *See also Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) (Florida statute giving widows but not widowers a $500 property tax exemption upheld as substantially related to the legitimate object of cushioning the disproportionate financial difficulties confronting a lone woman); *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (different tenure provisions for military men and women sustained because, under unchallenged scheme restricting the military role of women, service men and women are not similarly situated).

**8.** For discussion of intermediate equal protection standards, see *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 98–110, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting); *Vlandis v. Kline*, 412 U.S. 441, 458–59, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (White, J., concurring); Gunther, The Supreme Court, 1971 Term—Forword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L.Rev. 1 (1972).

**9.** We therefore need not decide whether we would consider justifications occurring to us but not asserted by the Representative. The extent to which equal protection courts will consider supporting interests not put forward by the government is unsettled and may vary with the governing equal protection standard.

*and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) and *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) that sovereign immunity does not bar suits against federal officials alleging that they acted unconstitutionally. *See Penn v. Schlesinger,* 490 F.2d 700, 703–04 (5th Cir. 1973), *rev'd on other grounds,* 497 F.2d 970 (5th Cir. 1974) (en banc), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). In addition, the reinstatement and promotion prayers, while impervious to sovereign immunity attack because in the nature of mandamus, *see Penn v. Schlesinger, supra; Beale v. Blount, supra,* would raise difficult issues concerning the proper exercise of equitable remedial discretion. In *Abbott v. Thetford,* 534 F.2d 1101 (5th Cir. 1976) (en banc) we refused to order a judge to reinstate his chief probation officer because the probation officer's personal criticisms of the judge made the necessary cooperative and confidential relationship impossible.[10] Although Davis has not, so far as this record shows, done anything to antagonize the Representative other than bring this lawsuit to vindicate her constitutional rights, we would remain very hesitant to order reinstatement of a representative's personal assistant. *Cf. Lumley v. Wagner,* 1 DeG., M. & G. 604, 42 Eng.Rep. 687 (Ch. 1852).

Intervening events, however, have blunted the importance of these issues. We take notice that Representative Passman was defeated in the 1976 primary election. His tenure in Congress will therefore apparently come to an end on January 3, 1977. That the term is not yet completely over saves the specific-relief claims from technical mootness, but they have certainly lost their significance. We assume Davis will not press her reinstatement or injunction prayers, and we pass on to other remedies.

## B. *Damages*

Davis's damages claim takes us through a five-stage analysis. First, damages are available under the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Second, the Supreme Court's more recent decision in *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) does not affect the *Bivens* remedy under the circumstances here. Third, sovereign immunity does not bar Davis's claim for damages against Representative Passman individually. Fourth, the speech or debate clause does not shield the Representative. Fifth, although the Representative can assert qualified official immunity at trial, that doctrine is insufficient to support a motion to dismiss. In sum, Davis's damages claim must be remanded for trial.

## 1. *Bivens*

◼ Davis's claim for damages is predicated upon *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra.* There the Supreme Court held that a damages remedy for an unconstitutional search and seizure could be implied directly from the Constitution itself. The Court rejected the government's argument that the complainant should have been relegated to a state law tort action and that the Constitution's sole function was to limit the scope of the officers' privilege defense, holding that the constitutional damages action was independent of state tort law. The Court explicitly rejected the government's argument that damages should be available only if "necessary to enforce the Fourth Amendment." 403 U.S. at 397, 91 S.Ct. at 2005. Among other things, the Constitution is a compendium of rights, and their enforcement does not depend upon statutory enrollment. As *Bivens* establishes, legislative inaction does not vitiate constitutional rights. Statutory actions may give breath to constitutional rights, but congressional inaction cannot suffocate them.

---

10. In *Abbott* the en banc court adopted Judge Gewin's dissent from the panel opinion, *see* 529 F.2d 695, 701–08 (5th Cir. 1976).

Although Davis's claim arises under the fifth amendment, not the fourth, we find no basis in *Bivens'* language or rationale for according any significance to this distinction. The rights protected by the fifth amendment due process clause are every bit as fundamental as fourth amendment rights. Here, as in *Bivens*, damages simply constitute "a particular remedial mechanism normally available in the federal courts," 403 U.S. at 397, 91 S.Ct. at 2005.

Indeed, here the case for implying a damages remedy is even stronger than in *Bivens*. In the *Bivens* situation state tort law is available to remedy some constitutional violations, and the exclusionary rule also sometimes provides a remedy. The case for implying a constitutional damages remedy becomes more compelling when, as here, there is no meaningful alternative remedy. Mr. Chief Justice Marshall's time-honored call for justice provides a guiding principle not lightly to be ignored: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), quoted in *Bivens, supra*, 403 U.S. at 397, 91 S.Ct. [1999] at 2005.

Our conclusion that *Bivens* is not limited to fourth amendment claims draws support from various court of appeals decisions. We have ourselves upheld an arrested person's complaint seeking damages directly under the Constitution for the denial of proper medical care. We said that the conduct might have violated the fourteenth amendment's due process clause or the eighth amendment, and that the complaint stated a damages claim. *See Reeves v. City of Jackson, Mississippi*, 532 F.2d 491, 495 (5th Cir. 1976). *See also Roane v. Callisburg Independent School District*, 511 F.2d 633 (5th Cir. 1975) (fourteenth amendment due process). Other circuits that have decided the issue are in accord. *See Brault v. Town of Milton*, 527 F.2d 730, 734 (2nd Cir.), *rev'd en banc on other grounds*, 527 F.2d 736 (2nd Cir. 1975) (damages action for fourteenth amendment due process violation "comes within *Bivens'* sweeping approbation of constitutionally-based causes of action"); [11] *United States ex rel. Moore v. Koelzer*, 457 F.2d 892 (3rd Cir. 1972) (fifth amendment due process); [12] *States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146 (4th Cir. 1974), (fifth amendment due process).[13] In extending *Bivens* to fifth amendment due process claims, *States Marine* used language squarely applicable in our case:

> The necessity and appropriateness of judicial relief is no less compelling in this case than it was in *Bivens*. As in *Bivens*: A common law or state tort remedy may or may not afford a means of redressing this wrong, but in any case, will not be tailored specifically to cases of lawlessness pursuant to federal authority; the claim presented is obviously appropriate for money damages; and other remedies such as injunctive or relief in the nature

11. *Brault* addressed the complicating issue, not present in our case, of whether the exclusion of cities from the definition of "person" in 42 U.S.C. § 1983 affected the existence of the *Bivens* cause of action. *See generally* Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922 (1976). *Brault* upheld the constitutional action despite § 1983. We reached the same result in *Roane v. Callisburg Independent School District, supra* and *Reeves v. City of Jackson, Mississippi, supra*. *See also Cox v. Stanton*, 529 F.2d 47 (4th Cir. 1975); *Fine v. City of New York*, 529 F.2d 70, 77 (2d Cir. 1975) (Smith, J., concurring and dissenting). *Cf. Rotolo v. Borough of Charleroi*, 532 F.2d 920 (3rd Cir. 1976); *Amen v. City of Dearborn*, 532 F.2d 554 (6th Cir. 1976).

12. *Moore* extended *Bethea v. Reid*, 445 F.2d 1163 (3rd Cir. 1971), *cert. denied* 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972) (fourth and fifth amendments).

13. In addition to the Second, Third and Fourth Circuit holdings cited in text, the Tenth Circuit has intimated that *Bivens* extends beyond the fourth amendment. *See Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926 (10th Cir. 1975). The issue is open in the D.C. Circuit. *See Lewis v. D.C. Dep't. of Corrections*, 174 U.S. App.D.C. 483, 533 F.2d 710 (1976). Although the district courts have split, the best reasoned opinions have reached our result. *See, e. g., Panzarella v. Boyle*, 406 F.Supp. 787 (D.R.I. 1975).

of mandamus are no longer viable alternatives.

498 F.2d at 1157.

■ Finally, we note that measuring damages presents no insuperable problem. Representative Passman was free, within constitutional limits, to dismiss Davis at any time. But if the actual dismissal is found at trial to have been unconstitutional, then lost salary should be taken into account in assessing damages. The situation is analogous to a substantively justified dismissal accomplished in a procedurally unconstitutional way. That a defendant could have dismissed an employee without violating the Constitution has never been thought to preclude the award of damages for a dismissal that was in actuality unconstitutional. Cf. *Silver v. New York Stock Exchange* 373 U.S. 341, 365 n.18, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

## 2. *Brown*

■ Our conclusion, then, is that *Bivens* gives Davis a damages remedy for Representative Passman's deprivation of her due process rights. We pause briefly, however, to reject the notion that sweeping language in a recent Supreme Court decision dictates a contrary result. In *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) the Court held that the 30-day limitation on bringing Title VII employment discrimination suits against the federal government could not be avoided by the simple expedient of bringing the action directly under the Constitution. The *Brown* holding is inapplicable here because Davis never had a Title

VII action. Title VII excludes members of congressional staffs from its protection.[14]

The inapplicability of the *Brown* holding does not, however, answer the contention that some of its language seems on casual examination to preclude Davis's constitutionally based claim. The issue arises from Mr. Justice Stewart's framing of the *Brown* issue:

> The principal question presented by this case is whether § 717 of the Civil Rights Act of 1964 provides the exclusive judicial remedy for claims of discrimination in federal employment.

425 U.S. at 821, 96 S.Ct. at 1963, 48 L.Ed.2d at 405. Taken for all it might be worth, this language would deny Davis not only a damages remedy but any remedy whatsoever.

We refuse to accord the language such broad scope. In the first place, a moment's reflection indicates the incongruity of importing Mr. Justice Stewart's language into our case. It simply makes no sense to speak of an "exclusive judicial remedy" when there is no remedy at all. *Brown* establishes that Title VII is the exclusive judicial remedy for federal employment discrimination to which Title VII extends, but in areas not touched by Title VII other remedies are not affected.

This is conclusively established by *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), decided the very same day as *Brown*. In *Mow Sun Wong* the Court invalidated the Civil Service Commission's rule excluding aliens from most federal employment.[15] Title VII does not prohibit discrimination against aliens, *see Espinoza v. Farah Manufacturing Co.*,

14. 42 U.S.C. § 2000e–16(a) makes the federal government employment discrimination provisions inapplicable to legislative branch positions not in the competitive service, and congressional staffs are not in the competitive service.

15. The *Mow Sun Wong* plaintiffs challenged the commission's rule under the fifth amendment's equal protection principle. The Court noted that overriding national interests might conceivably provide a justification for a citizenship requirement in the federal service. With-

out resolving that issue, the Court held that due process required that there be a legitimate basis for presuming that the rule was actually intended to serve the asserted national interest. Because the rule had been adopted by the Civil Service Commission, whose only concern was the promotion of an efficient federal service, the Court found no basis for assuming that it was in fact intended to further any overriding national interests. Accordingly, the Court invalidated the rule, at least pending presidential or congressional approval of its policy.

414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), just as Title VII does not prohibit sex discrimination against congressional staff members. In *Mow Sun Wong* the Supreme Court thus accorded a non-Title VII judicial remedy for a claim of federal employment discrimination. By its action on the very same day *Brown* was decided, the Court made clear that the "exclusive remedy" language applies only to employment discrimination covered by Title VII.[16]

■ We need not, however, rely solely on *Mow Sun Wong*. The whole structure of the Court's argument in *Brown* has no relevance to discriminations not within Title VII's domain. The Court first argued that when Congress extended Title VII to federal employment in 1972 it believed, rightly or wrongly, that no other remedy existed. From this the Court deduced that Congress fashioned a remedy believed adequate standing alone to cure the discriminatory ills being brought within the ambit of Title VII. But Congress's belief that no remedy existed, coupled with its failure to enact any remedy, scarcely demonstrates a belief that no remedy was needed for discrimination left outside Title VII. For, as is well established, Congress need not address all facets of a problem in a single piece of legislation; it is free to enact remedial legislation element by element at a pace most acceptable to the legislative mind. *See, e. g., Railway Express Agency v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

The *Brown* Court's second line of argument is equally inapplicable to discriminations outside Title VII. It reasoned that

[t]he balance, completeness and structural integrity of § 717 are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief.

425 U.S. at 832, 96 S.Ct. at 1968, 48 L.Ed.2d at 411.

The Court was certainly correct that the "balance, completeness and structural integrity" of the statute would be undermined if its 30-day limitations period could be rendered meaningless by bringing an action on some other basis. The "structural integrity" of the statutory prerequisites to invoking Title VII cannot be undermined, however, by the provision of a remedy for conduct not governed by Title VII. Our decision leaves Title VII fully operative within its sphere.

In addition, we note another obstacle preventing *Brown* from affecting our case. The *Bivens* remedy is based on the Constitution itself. We remain ever willing to defer to congressional views, but we cannot do so at the expense of constitutional principles. Nothing in *Bivens* suggests Congress could repeal the damages remedy without enacting a suitable alternative. The Court did say, in rejecting defendants' argument that the issue was whether the damages remedy was "necessary" to enforce the fourth amendment, that "we have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress." 403 U.S. at 397, 91 S.Ct. at 2005. The case at bar is no different in this respect than *Bivens*. The 1972 additions to Title VII cannot be said to constitute an "explicit" congressional disapproval of the damages remedy, and more fundamentally there is not "another remedy, equally effective in the view of Congress," to which Davis has been remitted. Moreover, even if we somehow ignored these plain truths, the *Bivens* passage would simply mean that the relevant inquiry would be whether a damages remedy

---

**16.** *Mow Sun Wong* was not a damages case and does not preclude *Brown* from being read to make Title VII the exclusive *damages* remedy for claims of federal employment discrimination. *Mow Sun Wong* does conclusively establish, however, that the Court's broad language in *Brown* is subject to qualifications, and for the reasons developed herein we see no reason to strain to make *Brown*'s language applicable to our case.

is "necessary" to enforce the fifth amendment due process clause. Under this framing of the issue, at least until an alternative remedy were made available, Davis would still prevail. Congress is free to enact an adequate substitute remedy; to that extent the *Bivens* remedy therefore constitutes constitutional common law. *See* Monaghan, The Supreme Court, 1974 Term—Forword: Constitutional Common Law, 89 Harv.L.Rev. 1, 23–24 (1975). Congress has not done so, however, and the constitutionally-based *Bivens* damages remedy is available to Davis here.

When we deal, as we do here, with centrifugal and centripetal forces in operation, we, as judges, must come to a stasis, but in arriving there we do not draw the lifeblood from the legislative process nor skeletonize the constitutional rights with which every citizen is endowed even when dealing with Congress. The exemption of Congress from Title VII does not have a cosmic cover. Title VII among other things implements constitutional rights, but here an open declaration of non-implementation because of the exemption accorded Congress does not import into our case the exclusivity of Title VII actions. When the statute affords relief from a constitutional invasion, the statutory methodology should be followed, but when the statute does not attempt to implement the constitutional rights sought to be

vindicated, we cannot then use the statute as the sword to demean or to eliminate the constitutional right. The constitutional right stands on its own words without the necessity of Title VII's supporting procedures. Title VII's exemptions cannot build a haven for constitutional transgressors.

■ One last issue regarding *Brown*'s effect on the *Bivens* cause of action remains to be canvassed. Congress could attempt to remove the federal courts' *jurisdiction* to hear such claims. Jurisdiction here is predicated upon 28 U.S.C. § 1331(a), as it was in *Bivens*. The amount in controversy exceeds $10,000. Any argument that in expanding Title VII in 1972 Congress excepted constitutionally-based federal employment discrimination claims from § 1331 must be rejected out of hand. Congress did not speak in jurisdictional terms, nor did the Court in *Brown v. General Services Administration, supra,* when it employed the "exclusive judicial remedy" language. In *Hampton v. Mow Sun Wong, supra,* the Court exercised § 1331 jurisdiction over a constitutional challenge to federal employment discrimination, indicating that the Court did not read Title VII's provisions as taking such claims out of § 1331.[17] We hold that the district court has jurisdiction to adjudicate Davis's *Bivens* action on its merits. The damages remedy is available.[18]

17. Moreover, any denial of jurisdiction to hear Davis's claim would itself raise grave constitutional issues. Congress can limit the federal courts' jurisdiction to afford one remedy when minimally adequate alternative remedies are available, *see, e. g., Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Lockerty v. Phillips,* 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943), but our entire constitutional structure and the great esteem we accord individual rights dictate the conclusion that Congress cannot foreclose the last avenue of redress for a constitutional deprivation. *See generally,* P. Bator, P. Mishkin, D. Shapiro and H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System 330–60 (2nd Ed. 1973) (the "Dialogue"). In the usual situation Congress may have plenary authority to remove the federal courts' jurisdiction because the state courts, having general jurisdiction, remain open to redress constitutional wrongs. The authority of state courts to render relief against a United States Representative under

the circumstances here, however, is subject to doubt. *Cf. Tarble's Case,* 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1872). In the absence of any indication that Congress intended the Title VII amendments to cut back on § 1331, we will not attribute to them a meaning of such doubtful constitutionality. *Cf. Johnson v. Robison,* 415 U.S. 361, 366–67, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Weinberger v. Salfi,* 422 U.S. 749, 761, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975); *Gallo v. Mathews,* 538 F.2d 1148 (5th Cir. 1976).

18. Indeed, at oral argument the Representative's attorney apparently conceded that *Bivens* controls:

> Your honor, I acknowledge to the court that if this court should find that there is a federally constituted right then Bivens versus the seven narcotics folks does imply a right of action.

### 3. Sovereign Immunity

After carefully reviewing a variety of sovereign immunity decisions we are perhaps to be excused for concluding that the doctrine's primary effect has been to inject confusion into lawsuits involving the government and its agents. In the case at bar, however, the district court was not misled. It properly rejected the sovereign immunity plea.

At this point we address the applicability of sovereign immunity only to damages actions. When, as here, an action seeks to impose liability upon a government official in an individual capacity, sovereign immunity poses no bar. Although sovereign immunity sometimes shields the United States Treasury from a plaintiff's claims, it does not protect the personal checkbook of an individual government official to any extent at all.

Representative Passman does not contest these principles, nor could he in light of the myriad cases inconsistent with any other view of sovereign immunity. For example, *Bivens* itself would have been barred if actions against government officials individually came within the sovereign immunity doctrine.

The contention Representative Passman does make is that this action is really an attempt to recover against the United States Treasury. Admittedly, Davis's complaint is not free of ambiguity. She did use the phrase "back pay" in her relief prayer, and we could conceivably construe "back pay" as limited to salary from the government rather than damages from Representative Passman individually. Her claim would then contravene *Penn v. Schlesinger*, 490 F.2d 700 (5th Cir. 1973), *rev'd on other grounds*, 497 F.2d 970 (5th Cir. 1974) (en banc), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976) where we held sovereign immunity a bar to two forms of money relief "both of which would impinge upon the Treasury." 490 F.2d at 705. We refuse, however, to give the complaint such a niggardly, technical construction. Davis's position in this court makes clear that she seeks damages from the Representative individually, not merely government-paid salary. Moreover, a reading of the complaint as a whole accords with this view. She alleged other items of damages besides lost salary, including injury to reputation,[19] and in addition to "back pay" her relief prayer sought "such other and further relief as may be proper." The named defendant was, of course, Representative Passman, not the United States of America. To read Davis's complaint as not seeking damages against Representative Passman individually would require a return to the technicalities of the common law writ system. The Federal Rules of Civil Procedure countenance no such result. Sovereign immunity does not bar Davis's claim.[20]

### 4. Speech or Debate

We turn now to whether the doctrine of legislative immunity, which in

19. Davis can of course recover lost salary in addition to these other items of damages; we advert to the other items to illustrate that Davis did not use "back pay" in any restricted sense meaning government-paid salary only.

20. A somewhat related line of cases in this circuit deals with whether a city employee can recover money when unconstitutionally discharged. Because a city is not a "person" within 42 U.S.C. § 1983, that statute does not authorize a "back pay" award that would run against the city, even if the nominal defendants are city officials. *Thurston v. Dekle*, 531 F.2d 1264, 1269 (5th Cir. 1976). But a recovery of money from individuals rather than the city is available. *See Muzquiz v. City of San Antonio*, 528 F.2d 499, 500 n. 5 (5th Cir. 1976) (en banc), *petition for cert. filed*, 44 U.S.L.W. 3727 (U.S. May 27, 1976). Although the issue of who is a "person" within § 1983 obviously is not the same as the issue of the scope of federal sovereign immunity, the *Muzquiz* distinction between money awards against governments and those against individual officers has the same effect in both situations. Whatever relief Davis's complaint would be construed as seeking if this were a § 1983 action involving a city, however, we construe it under the circumstances here as seeking damages against Representative Passman individually.

the federal context assumes constitutional stature under the speech or debate clause,[21] absolutely shields Representative Passman from any suit challenging a decision to dismiss an employee.[22]

The Supreme Court has decided a series of speech or debate cases but has not confronted the precise situation before us. The Court has held that members of Congress are immune from judicial inquiry into their votes, *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881); *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), their speeches on the floor of Congress, *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), their decisions to circulate information to other members of Congress, *Doe v. McMillan, supra,* their participation in committee investigations and proceedings, *Doe v. McMillan, supra; Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *Dombrowski v. Eastland,* 387 U.S. 82, 87 S Ct. 1425, 18 L.Ed.2d 577 (1967); *cf. Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and their issuance of subpoenas pursuant to a legitimate committee investigation, *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). Members of Congress are not immune, on the other hand, from judicial inquiry into their public distribution of materials gathered by committees, *Doe v. McMillan, supra; Gravel v. United States, supra,* or their acceptance of bribes in return for votes on pending legislative business, *United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

While none of these cases involved the dismissal of a staff member, we think their language and rationale compel a rejection of Representative Passman's immunity defense. We begin with a statement of the defense's purpose:

> The purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions.

*Powell v. McCormick,* 395 U.S. 486, 505, 89 S.Ct. 1944, 1955, 23 L.Ed.2d 491 (1969).

One could argue on Representative Passman's behalf that calling him into court to defend *any* action, whether related to congressional business or to his personal contracts or torts, risks distracting him from "legislative tasks." Supreme Court decisions, however, make clear that the speech or debate clause does not prohibit all such distractions. Calling Senator Gravel into court to testify concerning his arrangements with Beacon Press to publish the "Pentagon Papers," which he had earlier read into the Congressional Record, might have distracted him from legislative business, but the Court said Gravel was nonetheless not exempt from the inquiry. *Gravel v. United States, supra,* 408 U.S. at 622, 92 S.Ct. 2614. *Gravel* and other opinions finding the legislative immunity cloak wanting in particular settings, *see United States v. Brewster, supra; Doe v. McMillan, supra,* 412 U.S. at 314–15, 93 S.Ct. 2018, conclusively establish that subjecting Representative Passman to a damages action

---

**21.** The Constitution provides:

The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of the respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other place.
U.S.Const. art. I § 6.

The freedom from arrest does not prohibit service of process, *see Gravel v. United States,* 408 U.S. 606, 614–15, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and is inapplicable here.

**22.** We view "legislative immunity," sometimes referred to as "congressional immunity," as coextensive in the federal context with speech or debate protection. The terms all refer to the absolute immunity that members of Congress (and sometimes their functionaries) possess for certain legislative acts. We use the phrase "official immunity" to describe more generally the varying levels of "good faith," "privilege" or "immunity" defenses that numerous government officials can assert.

does not, without more, contravene the speech or debate clause.

▪▪▪ Rather than blanket immunity from burdensome litigation, the clause provides protection only against inquiries into legislative policy-formulation processes. Enacting legislation is the province of Congress and Congress alone. The speech or debate clause assures members of Congress that their actions in formulating and enacting legislation, from the committee stage through voting, will not be subjected to judicial (or executive) inquiry. But the immunized act must be intimately cognate to the legislative process. The reason for an absolute rather than qualified immunity is that the prospect of an unsuccessful but burdensome lawsuit might affect a legislator's performance of his or her legislative duties, thus distorting the democratic process. Because of our devotion to an unfettered representative government, we foreclose even well-founded lawsuits challenging the performance by members of Congress of their legislative roles.

The language of the Supreme Court's speech or debate decisions supports this view. *Tenney v. Brandhove, supra,* announced that legislators are protected when "acting in the sphere of legitimate *legislative* activity." 341 U.S. at 376, 71 S.Ct. at 788 (emphasis added).[23] More recent cases have elaborated on *Tenney's* oft-cited formula. In *Gravel v. United States, supra,* the Court said:

> The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of *speech, debate, and deliberation* without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process.

**23.** We adopted the *Tenney* formula in *City of Safety Harbor v. Birchfield,* 529 F.2d 1251 (5th Cir. 1976).

**24.** This passage from *Gravel* was emphasized again in *Eastland v. United States Servicemen's Fund, supra,* 421 U.S. at 503, 95 S.Ct. at 1821–22, 44 L.Ed.2d at 336. The issuance of subpoe-

408 U.S. at 616, 92 S.Ct. at 2622 (emphasis added).[24] The Court said the clause's purpose was "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct *as a legislator,*" 408 U.S. at 618, 92 S.Ct. at 2623 (emphasis added), adding that the three earlier speech or debate cases, *Kilbourn, Dombrowski* and *Powell,*

> reflect a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings.

408 U.S. at 620, 92 S.Ct. at 2625. The Court reiterated that "the Clause has not been extended beyond the legislative sphere", and, of particular relevance here, the Court emphasized that the fact that "Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature." 408 U.S. at 624–25, 92 S.Ct. at 2627. The *Gravel* Court continued:

> Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but "only when necessary to prevent indirect impairment

nas as part of a legitimate committee investigation was found to be an integral part of the process by which members participate in House proceedings with respect to the formulation and consideration of legislation; accordingly, speech or debate protection attached.

of such deliberations." *United States v. Doe,* 1st Cir., 455 F.2d 753 at 760. 408 U.S. at 625, 92 S.Ct. at 2627. The Court then stated its holding:

"Here, private publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence.

408 U.S. at 625, 92 S.Ct. at 2627.

A year later in *Doe v. McMillan, supra,* the Supreme Court reiterated the limited scope of the clause. In rejecting the argument that publication and distribution of a committee report was essential to the legislative process and therefore within the speech or debate clause, the Court said, "Our cases make perfectly apparent . . . that everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause." 412 U.S. at 313, 93 S.Ct. at 2025. The Court added, " '[t]his Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role.' " 412 U.S. at 320, 93 S.Ct. at 2028, quoting *Tenney v. Brandhove, supra,* 341 U.S. at 377, 71 S.Ct. 783 (brackets in original). Finally, the Court said,

The business of Congress is to legislate; Congressmen and aids are absolutely im-mune when they are legislating. But when they act outside the 'sphere of legitimate legislative activity,' *Tenney v. Brandhove,* 341 U.S., at 376, 71 S.Ct. 783, they enjoy no special immunity from local laws . . . . .

412 U.S. at 324, 93 S.Ct. at 2030.

These statements compel the conclusion that representatives are not immune from inquiry into their decisions to dismiss staff members. Such dismissal decisions certainly are not "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States, supra,* 408 U.S. at 625, 92 S.Ct. at 2627. Peripheral or tangential activities of a representative must not be confused with the legislative core. A representative's transgressions are not given absolute absolution. The Constitution establishes an immunity for aberrations in a representative's legislative activities, but members of Congress become mere mortals when they operate in more mundane fields. When members of Congress dismiss employees they are neither legislating nor formulating legislation. The fear of judicial inquiry into dismissal decisions cannot possibly affect a legislator's decisions on matters pending before Congress. The democratic process remains unfettered.[25]

---

**25.** One could argue on Representative Passman's behalf that, because high-ranking staff members may sometimes affect a legislator's performance of his or her deliberative role, dismissal decisions should be protected by the speech or debate clause. The justification for establishing absolute immunity would be that the fear of an unfounded but burdensome lawsuit might influence a decision whether to fire an assistant, thereby impermissibly affecting the legislative process.

We find, however, that such an argument cannot help Representative Passman. Our decision leaves members of Congress free to dismiss staff members for any reason or for no reason, so long as broad limits established by the Constitution are not exceeded. Representatives will be afforded a broad good faith defense, *see* page 881, *infra,* and will be subject to liability in only the most egregious cases. The very low likelihood of recovery in unfounded cases will make the number of filings low. Moreover, summary judgment procedures, if applied judiciously, will minimize any burden. The chance that a legislator's dismissal decision will be affected by the prospect of a burdensome but meritless suit is therefore remote. The prospect that a dismissal decision will in turn affect the legislative process is also extremely remote. These layered causation gaps defeat the argument for absolute immunity. By limiting representatives to qualified immunity we achieve the immunity doctrine's goals without needlessly sacrificing the availability of redress for clear constitutional violations.

Moreover, on this record we have no way of knowing whether Davis's position gave her a

Our decision today does no more than give effect to the Supreme Court's mandate in *Gravel*: "Legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons." 408 U.S. at 615, 92 S.Ct. at 2622. If legislators are bound by the law they create, they are even more clearly bound by the United States Constitution. The very premise upon which the Constitution stands is the equality of all persons before the law. Exceptions to that premise must be limited, guarded, and sparingly employed. Davis is entitled to have her claim heard on the merits.

## 5. Qualified Immunity

The inapplicability of speech or debate protection does not foreclose Representative Passman from asserting the same qualified immunity available to other government officials. *See generally Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[26] Although *Wood* and *Scheuer* were § 1983 actions, their reasoning is equally applicable to this action founded directly on the constitution. *Cf. Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972) (on remand) (Lumbard, J., concurring).

■■■■ The inapplicability of speech or debate protection does, however, foreclose Representative Passman from asserting an absolute official immunity such as that recognized in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Speech or debate protection is coextensive with the need to afford members of Congress absolute immunity. Absolute immunity extends only to certain key governmental officials, and then only when they are governing. It extends to prosecutors when they are prosecuting, *Imbler v. Pachtman, supra*, to judges when they are judging, *see Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and to legislators when they are legislating, *e. g., Kilburn v. Thompson, supra*. As indicated, however, legislators are not legislating when they dismiss staff members. For the same reasons that the speech or debate clause does not extend to staff dismissals, Representative Passman cannot invoke absolute immunity.

Qualified immunity is available "in varying scope," "the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." *Scheuer v. Rhodes, supra*, 416 U.S. at 247–48, 94 S.Ct. at 1692. The legitimate interest in assuring members of Congress broad discretion in their staffing decisions and the importance of staffing decisions to a legislator's performance dictate that the scope of the Representative's qualified immunity is broad. In limiting the immunity to "good faith, non-malicious action," however, the Court in *Wood v. Strickland* made clear that a violation of constitutional rights could not be justified by "ignorance or disregard of settled, indisputable law". 420 U.S. at 321, 95 S.Ct. at 999–1000, 43 L.Ed.2d at 225.[27] In light of the settled, indisputable principle that federal government sex discriminations not supported by rational (or perhaps compelling) legitimate justifications are unconstitutional, *see, e. g., Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), the likeli-

meaningful input into the Representative's legislative decisionmaking. Even if speech or debate protection extended to decisions to dismiss high-ranking assistants, the clause would not sustain the Representative's 12(b)(6) motion here.

**26.** We use "qualified immunity" as synonymous with "good faith defense." *See* note 22 *supra*.

**27.** *Wood* involved school officials, but we have applied its principles more broadly. *See Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (5th Cir. 1976). *See also Morris v. Travisono*, 528 F.2d 856 (1st Cir. 1976); *Mukmuk v. Commissioner of Dep't. of Correctional Services*, 529 F.2d 272 (2d Cir. 1976); *Hanneman v. Breier*, 528 F.2d 750 (7th Cir. 1976).

hood that Representative Passman will be able successfully to maintain a good faith defense even under the liberal standard governing congressional staffing decisions appears very remote.[28] Because this case must be remanded for a trial at which Representative Passman will be free to press his claim that the dismissal was not based on Davis's gender, however, we need do no more at this stage than point out that any qualified immunity plea will be governed by the principles to which we have adverted. The determination that Representative Passman cannot claim absolute immunity is sufficient to require reversal of the dismissal given in his favor. *See, e. g., Scheuer v. Rhodes,* 416 U.S. 232, 239, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Sims v. Adams,* 537 F.2d 829 (5th Cir. 1976).

C. *Declaratory Relief*

The final form of relief that Davis seeks is declaratory. Although a claim for declaratory relief could be pursued independently of any right to other types of relief, *see Powell v. McCormack,* 395 U.S. 486, 518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the absence of any forward-looking scope of operation for any declaration of Davis's rights as against Representative Passman, whose congressional tenure is virtually at its end, would make the propriety of such a declaration questionable.[29] This issue loses its significance, however, in view of our holding that a damages remedy is available. We therefore decline to pass on the propriety of declaratory relief.

III.  Conclusion

In summary, taking the complaint's allegations as true, Representative Passman's dismissal of a staff member on the basis of gender violated the equal protection component of the fifth amendment due process clause. Under *Bivens* the Constitution itself affords the dismissed staff member a damages remedy. Sovereign immunity does not bar a damages award against the Representative individually. The speech or debate clause does not extend to staff dismissals because they are not "legislative tasks" within the Supreme Court's holdings. Finally, the existence of qualified immunity cannot support the district court's dismissal of the complaint.

REVERSED AND REMANDED.

JONES, Circuit Judge (dissenting):

It seems to me that the judges should refrain from wearing their robes in the halls of the Congress. The doctrine of separation of powers should, I believe, require the affirmance of the dismissal of the action.

**28.** The good faith defense must of course be distinguished from a defense denying that the firing was discriminatory. The former asserts that the firing was unconstitutional but that the Representative acted in good faith and therefore should not be held liable. The latter asserts that gender was not the basis of the dismissal and that the dismissal therefore was not unconstitutional. *Wood* makes a successful assertion of the former defense unlikely; *Wood* does not affect the latter defense.

**29.** Davis has not alleged a desire to work for other representatives whose employment decisions might be affected by the resolution of her constitutional claims.