**Margaret S. RODRIGUEZ,**
**Plaintiff-Appellant,**

v.

**Donald E. RITCHEY et al.,**
**Defendants-Appellees.**

No. 75–1362.

United States Court of Appeals,
Fifth Circuit.

Aug. 3, 1977.

---

Robert W. Knight, Tampa, Fla., for plaintiff-appellant.

Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., Robert E. Kopp, Atty., Barbara L. Herwig, Atty., Appellate Section, Civil Div., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before BROWN, Chief Judge, WISDOM, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL and FAY, Circuit Judges.*

TJOFLAT, Circuit Judge:

We are called upon in this case to consider the possible civil liability of Federal Bureau of Investigation (FBI) agents who were involved in a criminal investigation which culminated in the indictment and arrest of the plaintiff. The plaintiff alleges that the arrest was in violation of her fourth amendment rights and seeks damages under the authority of *Bivens v. Six Unknown Named Agents.*[1] We are unable to find, however, that the fourth amendment was infringed, and thus a *Bivens*-type action cannot be maintained. We are also unable to find that a cause of action under federal statutory or common law has either been alleged or established by the record. Thus, as no basis for federal jurisdiction has been presented, this action should be dismissed.

## I. Facts

The record before us discloses a bizarre set of circumstances indeed. It all began in the early 1970's when the Tampa office of

---

* Judge Thornberry did not participate in this case.

1. 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

the FBI launched a massive investigation into illegal gambling activities occurring in central Florida. As the investigation progressed, a judicially sanctioned tap was placed on the telephone of a suspect, Frank Vega.[2] A pen register was also installed to record numbers dialed from the Vega telephone.

On October 5, 1971, Mr. Vega telephoned the number 935–0024 and spoke with a woman named "Margo" about gambling activities. Unfortunately, the pen register malfunctioned and incorrectly recorded the number dialed as 935–9024. Agent Batley monitored and recorded the call.

Margo was not known to the investigators, and Agent Arwine was assigned the task of identifying her. Armed with only a somewhat unusual nickname and an incorrect telephone number, his first step was to check the Tampa criss-cross directory and the city directory. He found the number in neither book and correctly deduced that the number given to him was unlisted, a not surprising discovery in view of the fact that illegal activity was presumably being carried on over that exchange.

Agent Arwine next approached a security officer of the General Telephone Company in Tampa and asked him to identify the subscriber of 935–9024 for him. The officer complied, identifying Margaret S. Rodriguez, the plaintiff in this case, as the subscriber. But this information, too, was erroneous. The number was actually that of a pay phone, not that of Ms. Rodriguez.

At this point Agent Arwine quite understandably believed that he had identified "Margo." This belief was strengthened when he discovered that Ms. Rodriguez apparently used the diminutive "Margo" since she called her own, home-conducted business "Margo's Beauty Salon." He informed Agent Kinne, the case agent,[3] of his tentative identification.

Agent Arwine next took further steps to confirm his conclusion. He consulted the Tampa Police Department, the Hillsborough County Sheriff and the Tampa Credit Bureau and discovered that Ms. Rodriguez had operated her beauty salon for about sixteen years and had never been arrested. However, when Agent Arwine asked a detective of the Tampa Police vice squad whether he had ever encountered a Margaret or "Margo" Rodriguez in any of his gambling investigations, the detective responded in the affirmative. He related that he had investigated a Margaret Rodriguez who owned a beauty parlor. Oddly enough, our plaintiff was once again the victim of an unfortunate coincidence, for the Margaret Rodriguez referred to by the detective was not the plaintiff in this suit, but a namesake who was facing state criminal charges for gambling at that time.

Agent Arwine, apparently believing that he had adequately verified his identification of "Margo," shortly thereafter submitted his written findings to the case agent, Kinne. Subsequently, Agent Arwine was instructed to phone the suspect on a pretext to attempt a voice identification. Rather than using the erroneous pen register number, though, he looked up the number of Margo's Beauty Salon in the telephone directory and dialed it. He spoke to a woman who claimed she operated the beauty parlor, but he had not listened to the original recording of the Vega-Margo conversation so that the voices could be compared. Instead, during his entire investigation he relied upon a typed transcript of the conversation.

On February 1, 1972, Agent Kinne appeared before a properly constituted federal grand jury to testify. On the same day an indictment was returned in the United States District Court for the Middle District of Florida against Ms. Rodriguez and fifty-

---

**2.** The tap was authorized under the Omnibus Crime Control and Safe Streets Act, § 802, *as amended* 18 U.S.C.A. §§ 2510–20 (1976).

**3.** Although Agent Kinne is not specifically so designated in the record, it seems clear that he held the position of case agent. He was as-

signed the investigation of the gambling activities, he made the application for the wiretap of the Vega telephone, he received reports from other agents and he appeared before the grand jury.

six others, charging them with violations of 18 U.S.C. §§ 2, 371 and 1955 (1970).[4] Arrest warrants were immediately issued, but due to logistical difficulties and the need for simultaneous execution they were not served until March 3. Agents Ritchey and Sosbee, who had been called into the case to assist in executing the warrants, were directed to take Ms. Rodriguez into custody. They arrested her in her beauty parlor, and five hours later she was admitted to bail.

The true state of affairs began to unravel about a year later when, during pretrial discovery, Ms. Rodriguez's attorney was permitted to listen to the taped conversation between Vega and Margo. Her attorney told Agent Kinne that the female voice recorded was not that of his client. Agent Kinne then questioned a suspect who had been mentioned during the conversation about who the Margo was on the tape. The suspect claimed the only Margo that he knew was a Margaret Waltz. After questioning, Ms. Waltz admitted that she was the Margo on the taped conversation and disclosed that her telephone number was 935–0024. The indictment of Ms. Rodriguez was subsequently dismissed on the government's motion on May 31, 1973.

## II. Proceedings Below

On October 24, 1973, Ms. Rodriguez filed suit in the United States District Court for the Middle District of Florida against Agents Ritchey and Sosbee, the arresting officers, and other unknown investigative agents for violating her fourth amendment rights. She complained that there had been no probable cause for her arrest because her indictment was the result of "negligent police conduct." Defendants Ritchey and Sosbee moved to dismiss her complaint for failure to state a claim upon which relief could be granted and, alternatively, for summary judgment on the ground that the claim was barred by the doctrine of official immunity.[5] Their supporting affidavits recited that they had taken the plaintiff into custody pursuant to a warrant issued by the district court authorizing her arrest to answer the indictment. The district court denied the motions.

The unknown investigative agents, Batley and Arwine, the case agent, Kinne, and the Special Agent in Charge of the Tampa office, Santoiana, were subsequently identified and made parties defendant. The previous motions, joined in by these additional defendants, were renewed. The motion to dismiss was again denied,[6] but summary judgment was granted. The district court found as a matter of law from the affidavits of all the defendants that they had acted within the scope of their authority and in good faith, with a reasonable belief in the validity of their actions, and concluded that a good faith defense was both available and appropriate in this instance.[7]

4. The defendants were charged under section 1955 with conducting, financing, managing, supervising, directing and owning an illegal gambling business, which is defined as "a gambling business which—
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." 18 U.S.C. § 1955(b)(1) (1970).
They were also charged under 18 U.S.C. § 2 (1970) with aiding and abetting the violation of section 1955 and under 18 U.S.C. § 371 (1970) with conspiring to violate section 1955.

5. See Fed.R.Civ.P. 12(b)(6), 56.

6. It should be noted that the trial court did not have before it a motion to dismiss for want of subject matter jurisdiction, see Fed.R.Civ.P. 12(b)(1), nor did it raise the issue on its own initiative, see id. 12(h)(3).

7. The trial court followed the lead of several courts which have terminated Bivens-type actions on summary judgment because no material fact existed as to the defendants' good faith. See, e.g., White v. Boyle, 538 F.2d 1077 (4th Cir. 1976); Jones v. United States, 536 F.2d 269 (8th Cir. 1976), cert. denied, 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 750; Brubaker v. King, 505 F.2d 534 (7th Cir. 1974); Tritsis v. Backer, 501 F.2d 1021 (7th Cir. 1974). See also Williams v. Howard Univ., 528 F.2d 658 (D.C. Cir. 1976); Safeguard Mut. Ins. Co. v. Miller, 472 F.2d 732 (3d Cir. 1973); Jones v. Perrigan, 459 F.2d 81 (6th Cir. 1972); Bivens v. Six Unknown Named Agents, 456 F.2d 1339 (2d Cir. 1972).

On appeal, a divided panel of this court reversed the lower court in part.[8] The majority initially determined that a *Bivens*-type action had been successfully alleged, but agreed with the district court that the defendants were entitled to a good faith defense.[9] A review of the evidence demonstrated that none of the agents had acted with malice toward Ms. Rodriguez, as she readily conceded.[10] Consequently, the panel affirmed the summary judgments awarded Agents Batley, Ritchey, Sosbee, Kinne and Santoiana. As to Agent Arwine, however, the majority concluded that a jury issue had been created as to whether he had acted in reasonable good faith and remanded the action for trial as to him.[11]

*III. Analysis*

It is axiomatic that jurisdiction of a claim in the federal courts must find its base in one of three sources—federal statute, federal common law, or the United States Constitution.[12] Of these three sources of jurisdiction, only the Constitution is invoked as authority for Ms. Rodriguez's cause of action. She does not allege any federal statutory claim, and we agree that none is available.[13] The federal common law jurisdictional base has a somewhat nebulous place in this suit. Ms. Rodriguez does not assert a federal common law cause of action, and ordinarily this would end the matter. It could be argued, however, that such a claim is implicit in the facts recited in her complaint or those developed for summary judgment purposes.[14] Moreover,

To establish his good faith defense, several cases hold that an officer does not have to prove that he acted with probable cause in a constitutional sense. *Boscarino v. Nelson,* 518 F.2d 879 (7th Cir. 1975); *Bivens,* 456 F.2d at 1339; *id.* at 1348–49 (Lumbard, J., concurring). *See also Wood v. Strickland,* 420 U.S. 308, 319, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

8. *Rodriguez v. Ritchey,* 539 F.2d 394 (5th Cir. 1976).

9. *Id.* at 399–401.

10. The complaint of Ms. Rodriguez spoke only of "errors" made by the defendants and "negligent police conduct." Her attorney readily conceded both in his brief and at oral argument that the defendants did not act with malice aforethought. He argued instead that simple negligence alone would suffice to state a claim.

11. *Id.* at 401–04.

12. The latter two sources are established by 28 U.S.C. § 1331(a) (1970): "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy . . . arises under the Constitution, laws, or treaties of the United States." *See Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (cause of action stated under the Constitution); *Illinois v. Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (cause of action stated under federal common law). *See generally Nolan v. Meyer,* 520 F.2d 1276, 1278 (2d Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975).

13. The only two provisions which arguably have relevance are the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1970) and the Federal Tort

Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.* (1970). Section 1983, however, does not apply to the actions of the federal government. *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). Moreover, the FTCA, as originally enacted, excepted any claim brought against the government founded upon false imprisonment, false arrest, malicious prosecution or abuse of process. 28 U.S.C. § 2680(h)(1970). The FTCA was amended in 1974 to allow recovery for any such actions occurring subsequently if they arose from the "acts or omissions of investigative or law enforcement officers of the United States Government." *Id.* (Supp. IV 1974). *See generally Norton v. Turner,* 427 F.Supp. 138 (E.D.Va. 1977). Ms. Rodriguez was arrested prior to the amendments, however, and she did not join the United States as a party defendant.

14. Although a motion to do so has not been made, it could be advanced that, where a case is in summary judgment posture, the allegations of the complaint and answer should be deemed amended to conform to the proof under Federal Rule of Civil Procedure 15(b) before a court determines whether to grant judgment. This may be especially true in a case such as this, where the complaint contains broad factual assertions which might go beyond the articulated theory of recovery (i.e., the fourth amendment). Rule 15(b) states in relevant part,

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time,

the panel majority, although it did not articulate a federal common law base of jurisdiction, drew upon general common law tort theory to bolster its conclusion that a cause of action had been stated.[15] As a result, we deem it appropriate to consider whether a federal common law claim is present to support jurisdiction in this case.

Thus, our analysis of this case will be twofold. First, we will examine whether under the uncontroverted facts of this case a cause of action has been stated under the Constitution. We will then attempt to discern whether a claim has been successfully alleged under federal common law.

### A. Constitutional Tort

A federal cause of action for a "constitutional tort" was first established by the Supreme Court in *Bivens v. Six Unknown Named Agents.*[16] It was alleged in *Bivens* that agents of the Federal Bureau of Narcotics entered Bivens' apartment in the early morning without either probable cause or a search or arrest warrant. Turned out of bed, he was arrested, manacled and frisked while his apartment was searched "from stem to stern." He was taken to the station house and strip searched, but was released without charges ever being filed. The Supreme Court decreed that when an individual can demonstrate an injury resulting from the violation of his fourth amendment rights by federal officers, he may recover damages.[17]

It is clear from a reading of *Bivens* that a federal action for damages must be premised on the *unconstitutional* conduct of the officers.[18] As the Eighth Circuit has succinctly put it, "[i]t is elementary that, as a precondition to any ultimate success under the 'implied remedy' of *Bivens*, the plaintiff must demonstrate a deprivation of some constitutional right."[19] Ms. Rodriguez did indeed allege in a conclusory fashion that her fourth amendment rights had been violated, but we find that, under the admitted facts of this case, such an infringement could not possibly have occurred.

This case stands in stark contrast to *Bivens*, where federal agents were alleged to have acted without probable cause or a warrant and with unreasonable force in making the arrest. Nothing of the sort is contended here. Ms. Rodriguez concedes, as she must, that she was properly arrested pursuant to a grand jury indictment and a valid capias. Still, she claims that, because of the many mechanical and human errors that led to her misidentification and arrest, her seizure was improper and without probable cause.

 It is true that the fourth amendment does command that probable cause support a warrant.[20] However, just because a person validly arrested is later discovered to be innocent does not make the arrest "unlawful" for fourth amendment

---

even after judgment; but failure so to amend does not affect the result of the trial of these issues.

**15.** 539 F.2d at 400.

**16.** 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). For a lucid discussion of *Bivens* see Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv.L.Rev. 1532 (1972).

**17.** 403 U.S. at 397, 91 S.Ct. 1999.

**18.** *Id.* at 389, 396–97, 91 S.Ct. 2001 at 2005. The Court specifically distinguished cases where a constitutional violation was not adequately alleged: "Nor are we asked in this case to impose liability upon a congressional employee for actions contrary to no constitutional prohibition, but merely said to be in excess of the authority delegated to him by the Congress. *Wheeldin v. Wheeler*, 373 U.S. 647 [83 S.Ct.

1441, 10 L.Ed.2d 605] (1963)." 403 U.S. at 396–97, 91 S.Ct. at 2005.

**19.** *McNally v. Pulitzer Publ. Co.*, 532 F.2d 69, 76 (8th Cir. 1976); *see White v. Boyle*, 538 F.2d 1077 (4th Cir. 1976); *La Bar v. Royer*, 528 F.2d 548 (5th Cir. 1976). *See also Perel v. Vanderford*, 547 F.2d 278 (5th Cir. 1977).

**20.** The fourth amendment reads,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S.Const. amend. IV.

purposes.[21] To the contrary, it has long been settled that an indictment by a properly constituted grand jury conclusively determines the existence of probable cause

21. "A warrant is valid even though the court, through lack of information or otherwise, has issued it for the arrest of a person in fact innocent of the offense alleged." Restatement (Second) of Torts § 123, Comment a (1965).

22. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 612 n. 11, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), quoting *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *United States ex rel. Kassin v. Mulligan*, 295 U.S. 396, 55 S.Ct. 781, 79 L.Ed. 1501 (1935); *Ex parte United States*, 287 U.S. 241, 249–51, 53 S.Ct. 129, 77 L.Ed. 283 (1932); *United States v. Green*, 162 U.S.App.D.C. 402, 499 F.2d 538, 540–41 (1974); *United States v. Perkins*, 140 U.S.App.D.C. 76, 433 F.2d 1182, 1187 (1970). The Supreme Court in *Ex parte United States* held that due to the conclusive nature of the probable cause determination a refusal to issue an arrest warrant by a magistrate would be an abuse of discretion:

> The refusal of the trial court to issue a warrant of arrest [pursuant to an indictment fair on its face and returned by a properly constituted grand jury] is, in reality and effect, a refusal to permit the enforcement of the law. The authority conferred upon the trial judge to issue a warrant of arrest upon an indictment does not, under the circumstances here disclosed, carry with it the power to decline to do so under the guise of judicial discretion . . . .. 287 U.S. at 250, 53 S.Ct. at 132.

It is because of this conclusive nature of the probable cause determination that an arrestee is not entitled to a preliminary hearing before a magistrate if the grand jury has indicted him. *See Kassin*, 295 U.S. at 400, 55 S.Ct. 781; *United States v. Anderson*, 481 F.2d 685, 691–92 (4th Cir. 1973) (note cases cited therein); *United States v. Dorsey*, 462 F.2d 361 (3d Cir. 1972); *United States v. Farries*, 459 F.2d 1057 (3d Cir. 1972), cert. denied, 409 U.S. 888, 93 S.Ct. 143, 34 L.Ed.2d 145 (1972); *United States v. Coley*, 441 F.2d 1299 (5th Cir. 1971); C. Wright, 1 Federal Practice and Procedure § 80, at 137–38 (1969); Fed.R.Crim.P. 5(c) ("[T]he preliminary examination shall not be held if the defendant is indicted or if an information against the defendant is filed in district court before the date set for the preliminary examination.") *Compare id.* 40(b)(3)(A) ("If the prosecution is by indictment, a warrant of removal shall issue upon production of a certified copy of the indictment and upon proof that the defendant is the person named in the indictment."), *with id.* (C) ("If a person is arrested without a warrant, the hearing may be continued for a reasonable time, upon a showing of probable cause to believe that he is guilty of the offense charged. . . .")

and provides the authority for an arrest warrant to issue.[22] The conclusion to be drawn is readily apparent: Since there was no unconstitutional arrest, no claim has been stated under the *Bivens* rationale.[23]

This court has recently explained when an indictment is sufficient. We stated in *United States v. Mann*, 517 F.2d 259, 266–67 (5th Cir. 1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976),

> An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendants of the charge against which they must defend, and second, enables the defendants adequately to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Russell v. United States*, 369 U.S. 749, 763–764, 83 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) and cases cited; *United States v. Sanchez*, 5 Cir., 1975, 508 F.2d 388, 395. Whether the indictment sufficiently alleges a crime is an issue of law, not of fact. *United States v. Miller*, 5 Cir., 1974, 491 F.2d 638, 647, cert. denied, 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186; see Fed.R. Crim.P. 12(b)(1). On review of an order dismissing an indictment, the indictment is to be tested not by the truth of its allegations but "by its sufficiency to charge an offense," *United States v. Sampson*, 371 U.S. 75, 78– 79, 83 S.Ct. 173, 175, 9 L.Ed.2d 136 (1962), since the allegations contained in the indictment must be taken as true. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 33 n. 2, 83 S.Ct. 594, 598 n. 2, 9 L.Ed.2d 561 (1963); *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952). A defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956).

The *Costello* holding has been often reaffirmed. *See United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).

23. Our conclusion here is fully supported by our recent decision in *La Bar v. Royer*, 528 F.2d 548 (5th Cir. 1976). We held in *La Bar* that "the plaintiff has no personal cause of action against the federal agent who, acting within the scope of his authority, received and holds property seized legally under a warrant . . . .." *Id.* at 549.

Before proceeding, we parenthetically note that several courts, including our own, have extended the *Bivens* rationale to constitutional violations other than those involving the fourth amendment.[24] We do not have to consider such an issue in this case, however, for Ms. Rodriguez has throughout the proceedings below and on appeal alleged only a fourth amendment violation.[25] We therefore decline to speak as an en banc court at this time on the appropriateness of an extension of *Bivens* to other constitutional guarantees.

■ What procedure, then, would have been the proper one for the district court to have followed in this case? Ms. Rodriguez alleged in her complaint, as we have previously recounted, that she was seized in violation of the fourth amendment. According to the doctrine of *Bell v. Hood*,[26] this would ordinarily be enough to give jurisdiction to the district court under section 1331(a).[27] There are two exceptions to the *Bell* rule, however, and one is that where a claim is "wholly insubstantial and frivolous" a dismissal for want of jurisdiction is in order.[28] Ms. Rodriguez did not complain of patently egregious conduct such as that described in *Bivens*.[29] Instead, she related in her complaint that she had been indicted by a grand jury, and the motion to dismiss made clear that her arrest followed the indictment. At this point it became apparent to a legal certainty that no constitutional violation had been committed as alleged, and a dismissal for want of jurisdiction would have been in order under the wholly insubstantial and frivolous exception.[30] In the alternative, the motion to dismiss for failure to state a claim on which relief could be granted should have been acted on favorably.[31]

24. *See, e. g., Davis v. Passman*, 544 F.2d 865 (5th Cir. 1977) (fifth amendment); *Reeves v. City of Jackson*, 532 F.2d 491 (5th Cir. 1976) (eighth and fourteenth amendments); *Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975) (first amendment); *Yiamouyuiannis v. Chemical Abstracts Service*, 521 F.2d 1392 (6th Cir. 1975) (first amendment); *States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146 (4th Cir. 1974) (fifth amendment); *United States ex rel. Moore v. Koelzer*, 457 F.2d 892 (3d Cir. 1972) (fifth amendment); *Gardels v. Murphy*, 377 F.Supp. 1389 (N.D.Ill.1974) (first amendment); *Butler v. United States*, 365 F.Supp. 1035 (D. Hawaii 1973) (first amendment). *Contra, Archuleta v. Callaway*, 385 F.Supp. 384 (D.Colo.1974); *Moore v. Schlesinger*, 384 F.Supp. 163 (D.Colo. 1974) (first amendment).

25. *See Weise v. Syracuse Univ.*, 522 F.2d 397, 404 (2d Cir. 1975): "Whether a cause of action against federal officers might be fashioned directly under federal question jurisdiction, 28 U.S.C. § 1331, and the Fifth Amendment . . is a question not before us since no such jurisdictional basis was alleged." *Cf. Cruz v. Hauck*, 515 F.2d 322, 326-27 n. 5 (5th Cir. 1975) (even though suit under Habeas Corpus Act, 28 U.S.C. § 2243 (1970), was a possibility, discussion of that Act was unnecessary since suit was only brought under the Civil Rights Act, 42 U.S.C. § 1983 (1970)).

26. 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

27. *Lewis v. D. C. Dep't of Corrections*, 533 F.2d 710 (D.C. Cir. 1976) (per curiam); *Cox v. Stanton*, 529 F.2d 47 (4th Cir. 1975); *Weir v.*

*Muller*, 527 F.2d 872 (5th Cir. 1976); *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926 (10th Cir. 1975).

28. 327 U.S. at 682-83, 66 S.Ct. 773; *Junior Chamber of Commerce v. United States Jaycees*, 495 F.2d 883, 885-86 (10th Cir.), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). *See generally Hagans v. Lavine*, 415 U.S. 528, 536-38, 94 S.Ct. 1372, 1378-79, 39 L.Ed.2d 577, 587-88 (1974).

The other exception is "that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction." 327 U.S. at 682, 66 S.Ct. at 776.

29. Compare that complained of in *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974), and *Hartigh v. Latin*, 485 F.2d 1068 (1973), *cert. denied, sub nom. District of Columbia v. Marsh*, 415 U.S. 948, 94 S.Ct. 1470, 39 L.Ed.2d 564 (1974).

30. It is, of course, incumbent upon the federal courts to dismiss an action when it appears that they have no jurisdiction. *Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126, 2 L.Ed. 229 (1804); *Skidmore v. Syntex Laboratories, Inc.*, 529 F.2d 1244, 1248 n. 3 (5th Cir. 1976); Fed.R. Civ.P. 12(h)(3).

31. *See generally Hilgeman v. National Ins. Co. of America*, 547 F.2d 298 (5th Cir. 1977).

## B. Federal Common Law

We now turn to the question of whether Ms. Rodriguez has stated a claim for relief under federal common law. After consideration, we conclude that she cannot avail herself of any type of common law remedy, federal or otherwise.

 The panel majority in determining that the plaintiff had stated a federal cause of action sought support in the general tort law concept that one who affirmatively instigates or incites a false arrest is liable even though he did not actually participate in the seizure.[32] But common law false imprisonment theory is not applicable to the activity of either the investigative or the arresting agents in this case for several reasons. First, and most basically, an arrest made under authority of a properly issued warrant is simply not a "false" arrest, it is a "true" or valid one.[33] Second, if the facts supporting an arrest are put before an intermediate such as a magistrate or grand jury, the intermediate's decision breaks the causal chain and insulates an initiating party.[34] Third, the general rule is that one who is engaged merely in investigatory work is not liable for a resulting false arrest, even if he acted maliciously.[35]

 Since no action for false imprisonment would lie, the plaintiff under general tort law would have to sue for malicious prosecution.[36] But Ms. Rodriguez can find no comfort there, either, for she admits that a necessary element, malice, is entirely missing.[37] Indeed, her complaint speaks only of "negligent police conduct."

We think it clear, however, that whatever the status of the allegations under state

---

**32.** 539 F.2d at 400. *See generally* W. Prosser, The Law of Torts § 11 (4th ed. 1971); Restatement (Second) of Torts § 45 A (1965).

**33.** *Burke v. New York, N. H. & H. R. R.,* 267 F.2d 894 (2d Cir. 1959); W. Prosser, *supra* note 12, § 119, at 835. Comment b to § 45 A of Restatement (Second) explains,

In order for this Section to be applicable to an arrest, it must be a false arrest, made without legal authority. One who instigates or participates in a lawful arrest, as for example an arrest made under a properly issued warrant by an officer charged with the duty of enforcing it, may become liable for malicious prosecution . . . or for abuse of process, . . . but he is not liable for false imprisonment, since no false imprisonment has occurred. *See also id.* § 37, Comment b.

**34.** *See generally* Annot., 21 A.L.R.2d 643, 662–65, 674–79 (1952). *See also* Restatement (Second) of Torts § 45 A, Comment c (1965):

It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

**35.** *Carr v. National Discount Corp.,* 172 F.2d 899, 902 (6th Cir.), *cert. denied,* 338 U.S. 817, 70 S.Ct. 59, 94 L.Ed. 495 (1949). *See generally* Annot., *supra* note 14, at 694–97; Restatement (Second) of Torts § 37, Comment b (1965). *But see Jensen v. Barnett,* 178 Neb. 429, 134 N.W.2d 53 (1965); *Wehrman v. Liberty Petroleum Co.,*, 382 S.W.2d 56 (Mo.App.1964).

By engaging in this discussion of general tort law we do not intend to imply that state law is directly applicable to constitutional torts. That general tort law and the fourth amendment cannot be perfectly equated was established by *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Indeed, the *Bivens* Court gave strong indication that federal law is to control in actions based on a constitutional violation. *See* 403 U.S. at 392–94, 91 S.Ct. at 2002–2003, 29 L.Ed.2d at 624–625. We leave for another day, therefore, the case in which an officer is sued for his investigatory work which was a proximate cause of a constitutional violation in which the officer was not directly involved.

**36.** *See generally* W. Prosser, *supra* note 12; Restatement (Second) of Torts § 37, Comment b (1965). The tort of abuse of process is clearly inappropriate to the situation presented here, for no one contends that there was an ulterior motive involved in the issuance of the indictment or warrant. *See generally Dunn v. Koehring Co.,* 546 F.2d 1193 (5th Cir. 1977).

**37.** As recounted previously, Ms. Rodriguez's counsel freely admitted both in his brief and at oral argument that neither Agent Arwine nor any of his colleagues demonstrated any malice. It follows *a fortiori* that an action for malicious prosecution will not lie. *Reicheneder v. Skaggs Drug Center,* 421 F.2d 307 (5th Cir. 1970); W. Prosser, *supra* note 12, § 119. As Dean Prosser explains, "malice in law" is insufficient—"malice in fact" must exist. *Id.* at 847–49.

tort law, *Wheeldin v. Wheeler*[38] forecloses the issue of whether a case has been made out under federal law. In *Wheeldin*, an investigator for the House Un-American Activities Committee was alleged to have filled in, without authority and with malicious intent, a subpoena requiring the petitioner to appear before the Committee. This caused him great disgrace and the loss of his job. Nevertheless, the Supreme Court denied relief. After searching for a fourth amendment violation but seizing upon none, it turned to the question of whether a cause of action had been stated under federal common law. The majority refused to fashion a federal tort of abuse of process, elucidating that "it is perhaps needless to state that we are not in the free-wheeling days antedating *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The instances where we have created federal common law are few and restricted."[39]

The case at hand is controlled by *Wheeldin*. There a flagrant abuse of federal process did not dictate the creation of a federal common law remedy. Here the essentials of a common law action for false arrest, malicious prosecution or abuse of process have not even been alleged.[40] As a result, the conclusion seems inescapable that no cause of action has been stated under federal common law.[41]

### IV. Conclusion

In this case we have held that when one alleges an arrest without unreasonable force under a valid warrant issued pursuant to a properly constituted grand jury indictment, no cause of action is stated under the fourth amendment. Moreover, we have held that under the circumstances of this case no cause of action has been stated under federal common law. Due to our resolution of these issues, we need not determine whether the defendants are entitled to a good faith defense or whether the district court correctly granted summary judgment for them on that ground. This action must be remanded to the district court with directions to dismiss the complaint for want of subject matter jurisdiction.

REMANDED WITH DIRECTIONS TO DISMISS.

HILL, Circuit Judge, with whom GEE, Circuit Judge, joins specially concurring:

I generally agree with the very fine opinion of Judge Tjoflat. Under the admitted facts of this case, no constitutional infringement could possibly have occurred which would give Ms. Rodriguez an implied remedy under the rationale of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

I burden the case with my separate thoughts only to dispel an inference that might be drawn from the majority opinion. The majority correctly points out that "indictment by a properly constituted grand jury conclusively determines the existence of probable cause and provides the authority for an arrest warrant to issue." *Ante* at 1191. From this premise the majority concludes that since Ms. Rodriguez was admittedly indicted by a properly constituted grand jury, there was no unconstitutional arrest. Thus, Ms. Rodriguez has stated no claim under the *Bivens* rationale.

From this analysis, an inference that one might draw and on which I do not now wish to stamp my imprimatur is that indictment

---

**38.** 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963).

**39.** *Id.* at 651, 83 S.Ct. at 1445.

**40.** See notes 33–37 *supra* and accompanying text.

**41.** The most similar previous case found was *Sopp v. Gehrlein*, 236 F.Supp. 823 (W.D.Pa. 1964) (facts of the case found at 232 F.Supp. 881). There federal agents assisted in the investigation of a sodomy case. Due to unusual circumstances, an innocent person was indicted for the crime. After charges were dropped against her, she sued all involved in the investigation including the federal agents. The court simply cited *Wheeldin* and stated, "That case is authority for the conclusion that on the face of the complaint no federal cause of action can be made out against [the federal agents]." *Id.* at 825.

by a properly constituted grand jury immunizes all precedent conduct of investigative and prosecutorial authorities. I agree that an officer who simply executes an arrest warrant issued by a properly constituted grand jury cannot later be held liable for an unconstitutional arrest. However, should an officer maliciously or in bad faith seek to obtain an indictment from a grand jury, I am not now prepared to state that he should be allowed to escape responsibility by showing that he did such a good job that the grand jury indicted. Of course, that is not this case and I agree with the majority that under the admitted facts of this case, no claim has been stated under *Bivens*.

COLEMAN, Circuit Judge, with whom BROWN, Chief Judge, WISDOM, GOLDBERG, MORGAN and RONEY, Circuit Judges, join, dissenting:

The original panel opinion in this case is reported at 539 F.2d 394.

I need not repeat here all of the facts and circumstances detailed in that panel opinion.

Suffice it to say, a woman, a citizen of the United States, entitled to the protections of the Constitution, wholly innocent of any crime against the United States, with no suggestion from any source that she was guilty of such a crime, was caused to be indicted, arrested, and held in bail for many months, all because of the acts and conduct of an agent of the United States.

In my opinion, if there is any specific constitutional guarantee to which any citizen should be entitled it is the right not to be indicted and arrested for crimes which they know nothing about and of which they are altogether innocent. Indeed, the courts have frequently held that to be convicted when there is no evidence of guilt is a violation of due process.

The panel did not hold that Agent Arwine was guilty of such a violation but it did say, and I adhere to that opinion, that reasonable minds could differ about the validity of his asserted defenses and that he should not have had the benefit of a summary judgment; in other words, there was enough to justify submitting the case to the jury for a determination of whether all of his many, many gross errors of judgment and procedure amounted to such a reckless disregard of Mrs. Rodriguez's constitutional rights as to amount to willfulness.

I do not look upon this as being a tort case. It does not fit within the usual outlines of a tort case. I think it is a case of deprivation of constitutional rights, which occupies a special category, well recognized in our jurisprudence.

Neither would I attribute any controlling significance to the fact that the plaintiff mistakenly referred in her complaint to a violation of Fourth Amendment rights. The real issue was well known, well understood, and thoroughly developed on the proceedings which led up to a summary judgment. To deny Mrs. Rodriguez a chance for relief on this ground is to apply the old rules of common law pleading, long since discarded.

I would leave Mr. Arwine to the sound judgment of a jury as to whether constitutional rights were so recklessly ignored in this case that the luckless victim, injured but now left without a remedy, should be entitled to damages.

I respectfully dissent.

GOLDBERG, Circuit Judge, with whom BROWN, Chief Judge, WISDOM, COLEMAN, MORGAN, and RONEY, Circuit Judges, join, dissenting:

I agree with everything Judge Coleman has said but wish to add a few thoughts of my own. I cannot remain silent while the court traduces and reduces to a nullity an individual's right to remain free of unconstitutional intrusions by governmental agents.

In this case the plurality adopts the view that the Constitution leaves government agents free to testify falsely before a grand jury, to procure a baseless indictment, to arrest a totally innocent woman without any basis for believing her guilty of any crime, and to maintain a groundless prosecution for over a year before conceding the

woman's innocence and dismissing the charges. In order to conform such atrocities to constitutional standards, says the plurality, the agents need only convince a grand jury to return an indictment. To place such reliance on grand juries is to ignore the abuses to which those bodies are subject and, more importantly, to abdicate our solemn responsibilities for constitutional adjudication in favor of non-adversarial proceedings before lay persons. The plurality offers no reasons in support of its blind obeisance to the single grand jury determination, relying instead on a few precedents that arose in a completely different context and that speak not at all to the issues before us.

Judge Hill, concurring in the plurality's rejection of appellant's claims but not in the plurality's sweeping opinion, refuses to afford such unjustifiable conclusiveness to the grand jury's decision to indict. He apparently agrees with the district court that the government agents succeeded in marshaling undisputed facts that establish a good faith defense. While I find Judge Hill's position much less troublesome than that of the plurality, I disagree with him on the facts. I believe appellant Rodriguez is entitled to have a jury decide whether two of the agents acted in "good faith" as that term is used in the governing Supreme Court decisions. The rather remarkable facts demonstrate that the agents bungled their investigation so badly that their good faith is subject to considerable doubt. They reasonably should have known that they were failing to comply with constitutional norms. Moreover, one of the agents made false statements when explaining to the Department of Justice the steps he took to verify Rodriguez's alleged role in the gambling operation being investigated. Because the facts are so crucial to a proper resolution of the case, I set them forth in greater detail than does the plurality.

## I. Facts

In the fall of 1971, defendant James S. Kinne, a special agent of the Federal Bureau of Investigation (FBI), applied to a United States District Court for authorization to intercept messages to and from a particular telephone. On September 30, 1971, the district court issued the authorization. See 18 U.S.C. §§ 2510–2520. The wiretapped phone was in the residence of Frank Vega, who allegedly used it to operate an illegal gambling business. The judge also authorized the use of a pen register, a device for recording telephone numbers dialed from the particular phone.

On October 5, 1971, defendant John J. Batley, another FBI special agent, intercepted a call placed by Vega from the wiretapped telephone to an unknown woman. The pen register recorded the dialed number as 935–9024. The actual number, it has now been determined, was 935–0024.[1] No one questions Batley's authority to intercept the call.

Batley prepared a handwritten log concerning the call, identifying the female recipient of the call as "Barbara." A transcript that was later prepared identified the person called as "Margo." Defendant Joseph F. Santoiana, Jr., the special agent in charge of the investigation, assigned defendant Joseph A. Arwine to determine the identity and the residence of the call's recipient. Arwine, also a special agent, received copies of the handwritten log and of the transcript. He believed the number called had been 935–9024. He never listened to the recording of the conversation to attempt to determine whether the person for whom he was looking was named "Barbara" or "Margo"; instead, he proceeded to attempt to identify "Margo."

Exactly what the conversation revealed about "Margo" has never been established. Arwine asserts in his affidavit that the conversation pertained to gambling opera-

---

1. I accept as true the statement in Batley's affidavit that the pen register recorded the dialed number as 935–9024, despite the fact that the pen register print-out itself is not in evidence. Rodriguez's attorney had taken steps as part of the normal discovery process to examine the printout. He was precluded from examining it, however, because the district court granted summary judgment before the conclusion of the discovery process.

tions and indicated that "Margo" was a bookmaker. The transcript of the conversation, however, has never been produced. Rodriguez's attorney had initiated normal discovery procedures to obtain the transcript, but the district court granted summary judgment before the government produced it.[2]

Arwine began his investigation by using the 1971 Hill-Donnelly Criss Cross Telephone Directory and the 1971 City Directory. He determined that neither listed 935–9024. What he did next is a matter of dispute.

Arwine avers in his affidavit that he contacted an "unrecalled" employee of the telephone company. Arwine claims that that employee advised him that unlisted telephone number 935–9024 was subscribed to by Margaret S. Rodriguez of 3420 Grace Street in Tampa. That is the name and address of the appellant here.

Arwine's allegation, however, is contravened by a whole list of inconsistent undisputed facts. First, Rodriguez's telephone number is not and has never been 935–9024. Her number is 876–5646, a number that resembles 935–9024 only in that it contains seven digits. More importantly, there is *no* telephone subscribed in the name Margaret S. Rodriguez. Rodriguez's telephone is sub-

scribed in the name of her business, "Margo's Beauty Salon." The telephone company records do not contain the name Margaret S. Rodriguez.[3] In addition, the telephone company's records on Rodriguez's telephone are housed in a different building from that Arwine claims he contacted. Thus, the "unrecalled" employee did not have access to the relevant records.[4] Finally, telephone company policy was to release information concerning unlisted numbers only in response to subpoenas or in emergency situations. Except for oral responses in emergency situations, the company maintained records of all requests. The company has no record of any request with respect to 935–9024.[5]

In sum, for Arwine's affidavit to be true, the following scenario would have had to transpire. Upon receiving Arwine's request, the "unrecalled" telephone company employee would have had to transcribe incorrectly all seven digits of the relevant telephone number, magically retrieve the records on that number from a building located across town, miraculously discern that the owner of "Margo's Beauty Salon" was Margaret S. Rodriguez (a name not appearing in any telephone company records), and relay this information to Agent Arwine, all while Arwine patiently waited.

2. The government did append a short portion of the transcript to its brief before this court. That portion does not seem to me to indicate that the call's recipient was a bookmaker, but I must confess considerable ignorance with respect to the twisted jargon with which gamblers apparently communicate. At trial the government would be free to explain the conversation's meaning.

3. I draw this fact from statements of a telephone company official in a deposition upon written questions. He said the company records indicated the subscriber of 876–5646 was "Margo's Beauty Salon." The government speculates that other records might indicate that the owner of that business was Margaret S. Rodriguez. Nothing in the record gives any hint that that is true. On summary judgment we must assume it is not. The agents would be free at trial to prove otherwise.

4. Again, the government puts forth a speculative explanation. It claims an employee in one building could obtain records from another building across town. Arwine's description of

the event, however, seems to indicate he made a single contact with the employee. Nothing in this record indicates that during that contact—perhaps a phone call—the employee could have obtained records from the building across town. The government's factual explanation is the stuff of which closing jury arguments are made, not a proper basis for summary judgment.

5. The company also has no record of any request with respect to 876–5646. That number, of course, was listed. Company policy with respect to requests regarding listed phones was to refer the party to a crisscross directory. The "unrecalled" employee would have had to violate company policy whether believing the phone in question was listed or unlisted. The only other possibility is that Arwine lied to the employee, saying there was an emergency. Because over four months would elapse between the inquiry and the arrests, the situation obviously was not in fact an emergency.

Under these circumstances, whether Arwine contacted the telephone company is a disputed issue of fact. For purposes of assessing the agents' summary judgment motion, we must assume that he did not.[6]

Arwine determined that Margaret S. Rodriguez lived at 3420 Grace Street and that neither the Tampa police nor the Hillsborough County Sheriff's Office had ever arrested her. Arwine also checked with the Greater Tampa Credit Bureau, apparently learning that Rodriguez paid her bills. He received no adverse information about her at all. He learned that she had operated her own business for approximately sixteen years.

Arwine took one further step that seemed to him to indicate that Rodriguez was the "Margo" for whom he was looking. On December 5, 1971, he spoke to Sergeant John Fairbanks of the Tampa Police Department vice squad. Neither Arwine nor Fairbanks had access to their files at the time of the discussion. Arwine asked Fairbanks for information concerning a Margaret Rodriguez. Arwine gave no description at all of the Rodriguez for whom he was looking. He did not provide her address or the address of the beauty salon. According to Arwine, Fairbanks responded that he had "previously conducted an investigation of a Margaret Rodriguez, and it was his recollection that she was involved in gambling matters and had formerly owned a beauty salon." [7] Arwine did not ask Fairbanks to verify the information from his files, and

Arwine made no further effort to determine the status of Fairbanks's experience with "Margaret Rodriguez." In fact, it now appears, gambling charges were then pending against the Margaret Rodriguez of whom Fairbanks was speaking.[8] Because Arwine had already determined that the Margaret S. Rodriguez involved here had never been arrested, he could easily have determined that he and Fairbanks were speaking about different people. Arwine did not bother, however, to take the few seconds that would have been required to call Fairbanks at his office to determine whether they were concerned with the same Margaret Rodriguez. In a city with a large Spanish-surnamed population, Arwine could hardly have believed that "Margaret Rodriguez" could describe only one person.

In his affidavit and in his answers to interrogatories, Arwine took the position that he reached his conclusion solely on the basis of the investigation recounted above. In answering interrogatories Arwine denied that he had placed a call to 935–9024 in an effort to verify that Margaret Rodriguez did in fact subscribe to that telephone. A Justice Department internal memorandum, however, indicates that Arwine had earlier taken a contrary position. That memorandum, which is not in the record but which might become available if discovery were allowed to proceed, stated that Arwine had called 935–9024 on a pretext for the purpose of comparing the voice to the voice on the recording of the October 5, 1971 call.[9]

---

6. If Arwine did not obtain Rodriguez's name in response to his inquiry to the telephone company, the question remains where he did obtain her name. One obvious possibility is that Arwine simply looked up "Margo" in the telephone book and located Rodriguez's business, "Margo's Beauty Salon." It seems incredible that an FBI agent would use such an obviously unreliable technique in attempting to identify the "Margo" who had been implicated in the gambling investigation. Yet this record suggests no more likely explanation.

7. Contrary to the statement in the plurality opinion, Fairbanks did not say that that Margaret Rodriguez currently owned a beauty salon. Fairbanks said only that it was "his recollection" that she had "*formerly* owned a beauty salon." (Emphasis added). Arwine made the statement in his affidavit, not in response to

questioning or in some other context affording less opportunity for precision. I assume he used "formerly" because he meant it.

8. I take this assertion from Rodriguez's motion to the district court to amend its findings. If necessary the assertion could easily be verified.

9. The memorandum referred only to an agent, not to Arwine by name. A later memorandum makes clear the reference was to Arwine. The later memorandum came to the attention of the government attorney after the district court entered judgment and after the original argument to a panel of this court. The government attorney properly called that memorandum to opposing counsel's attention and, at his request, moved to supplement the record with an

It is now conceded, though, that Margaret Rodriguez has never had any connection with telephone number 935–9024. It would have been impossible for Arwine to call that number and speak to Margaret Rodriguez as the memorandum asserted he had done. Apparently upon realizing that the earlier statement was palpably false, Agent Arwine changed his story. He explained that when he made the verification call, he did not have his file in front of him, and he "must have" looked up the telephone number of Margo's Beauty Salon and made the call to the listed number, 876–5646. But that story, too, is remarkable. Arwine, who alleges that he had gone to great lengths to determine the subscriber of an *unlisted* telephone number, now asserts that when attempting to verify the subscriber of that number, he used a directory. No one has attempted any explanation of why an FBI special agent would use a telephone directory to determine an unlisted number.[10] I believe this maze of contradictory and untenable assertions places Arwine's credibility substantially in doubt.[11]

Arwine related to Agent Kinne that he believed the person for whom they were looking was Margaret S. Rodriguez. Kinne testified before the grand jury on February 1, 1972. That same day, the grand jury indicted Margaret S. Rodriguez. Our record does not disclose the contents of Kinne's testimony. The complaint alleges that Kinne testified falsely, and indeed that conclusion seems inescapable. We have no reason to believe that Kinne deliberately fabricated any of his testimony, but we certainly know that to the extent the testimony implicated Margaret S. Rodriguez, the testimony was false. Arrest warrants for Rodriguez and the fifty-six other persons indicted simultaneously issued February 1, 1972.

On February 3, 1972, two days *after* the indictment, Kinne spoke to Gene Bennett, whom he believed to be the "Gene" to whom the parties to the October 5, 1971 telephone call had referred. Kinne read Bennett a transcript of the call. Bennett acknowledged that he was the person discussed in the call but denied knowing any "Margo" who was a bookmaker. Kinne did not pursue the conversation or take any steps to investigate the possibility that the "Margo" he had had indicted was not a bookmaker. On March 3, 1972, FBI special agents Donald E. Ritchey and Geral W. Sosbee arrested Rodriguez in the presence of her family and a customer.

Over a year later, when Rodriguez's attorney succeeded in piercing the investigation's elaborate facade, Kinne again interviewed Bennett. This time Kinne took the conversation further. Bennett said that the only "Margo" he knew was "a woman who worked for the Li'l General Store on Armenia Avenue in Tampa" and who "used to play the dogs occasionally." Further investigation revealed that the Margo of the Li'l General Store, Margaret Waltz, was indeed the Margo who received the October 5, 1971 telephone call. Her telephone number was not 935–9024, the number recorded by the

excerpt. The earlier memorandum has never been made available. Our decision today prevents us from learning what else that memorandum might reveal about the agents' activities.

10. Nor has anyone attempted to explain why Arwine looked up "Margo's Beauty Salon" rather than "Rodriguez". Arwine's story is that a telephone company employee told him that the number in question was subscribed by "Margaret S. Rodriguez". Acting upon that information, if Arwine had desired to look up the number he presumably would have turned first to "Rodriguez". When the listing failed to appear, Arwine might have decided to try the business name, "Margo's Beauty Salon". A jury might choose to believe, however, that

when no listing appeared for Margaret S. Rodriguez, Arwine would have recalled that the number was unlisted.

11. The purpose of Arwine's phone call, according to the government's paraphrase of the memorandum, was "voice identification." Arwine, however, has denied that he ever listened to the recording of the October 5, 1971 phone call. The Government has attempted no explanation of how Arwine could have attempted any "voice identification" when he had never listened to the voice of the person for whom he was looking. This is but another in a list of contradictory statements that should be submitted to a jury for resolution.

pen register, but 935–0024. From this little additional effort, which presumably would have produced the same result in February 1972 when Kinne first interviewed Bennett (or, indeed, before the indictment), Kinne was able to determine conclusively that Rodriguez had had no role whatsoever in the gambling operation.[12] In May 1973, a little over a month after Kinne learned Rodriguez had been erroneously indicted, the indictment was finally dismissed.

## II. The Complaint and the Proper Analytical Framework

Apparently believing that the government's dismissal of the charges constituted inadequate recompense for the abuses she had suffered, Rodriguez filed this suit for damages against the agents involved. When she filed the suit she was unaware of most of the facts recounted above; she knew only that her government's criminal justice system had grievously malfunctioned, resulting in her arrest without any cause whatsoever. Because of her lack of knowledge at that time, her complaint was understandably lacking in elaborate detail. Rather than embellishing the complaint with the kind of exaggerated, meaningless rhetoric that often accompanies meritless allegations, she delivered a "short and plain statement of the claim." Fed.R.Civ.P. 8(a). She alleged that unknown FBI agents committed errors in the investigative process, that one or more agents testified falsely before the grand jury, that no probable cause existed for her arrest or for the underlying charges, and that as a result she had suffered considerable damage.[13]

I have little difficulty concluding that this complaint states a claim upon which relief could be granted [14] and that summary judgment is inappropriate. The crucial first step in assessing these issues is to clarify the analytical framework. Too often, distinct problems become merged, obfuscating the analysis. I believe three issues should be kept separate and addressed in turn.

The first question is whether the defendants violated the Constitution. If the answer is no, the case is at an end; the complaint fails to state a claim.[15] If the answer is yes, the second question comes into play: whether, given the constitutional violation, Rodriguez has a cause of action for damages against the agents. Again, if the answer is no, the case is at an end; Rodriguez seeks no relief other than damages. If the answer is yes, the final question arises: whether the agents are immune from liability because they acted in good faith.

In the sections that follow, I explain my view that Rodriguez should prevail on each of these three questions. With respect to the first question—constitutionality—I would have thought no discussion necessary to establish that the Constitution proscribes the arrest without probable cause of a totally innocent woman. The Constitution also proscribes the agents' antecedent conduct that brought about the indictment and arrest. The second question—the existence of a cause of action for damages—is answered by *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Damages are an available remedy for the agents' constitutional transgressions. The third question—qualified immunity—requires a careful analysis of the rec-

---

12. The government asserts Bennett would not have provided the information at the earlier time. We must, however, resolve this factual dispute against the government in this summary judgment context.

13. She named as defendants the two agents who made the arrest itself (Donald E. Ritchey and Geral W. Sosbee) and "other as yet unknown named agents of the Federal Bureau of Investigation." The court later joined as defendants agents Arwine, Kinne, Batley and Santoiana.

14. A majority of this court may agree that the complaint itself is sufficient. That majority would consist of the six dissenters and Judge Hill, whose opinion I read as accepting the government's argument that the agents have established the affirmative defense of good faith, entitling them to summary judgment.

15. My view of the case makes it unnecessary to address federal common law not based on the Constitution.

ord against the backdrop of recent Supreme Court pronouncements. Because there exists a disputed issue of fact with respect to whether agents Arwine and Kinne reasonably should have known that their conduct exceeded constitutional bounds, their good faith defense presents a jury question. The other agents are entitled to summary judgment.

## III. Constitutionality

### A. *The Governing Provisions*

It is hardly a novel doctrine that the Constitution imposes limits upon the criminal justice system. When a federal agent conducts an investigation knowing that his recommendation will result in the lodging of criminal charges and then in arrest, he is under a constitutional duty to conform his behavior to some broad outer limit. That duty derives from both the fourth and fifth amendments. The fourth amendment prohibits arrests absent probable cause, the inevitable result of sufficiently incompetent investigative techniques and sufficiently careless grand jury testimony. The fifth amendment's due process clause embodies principles of fundamental fairness sufficient to guarantee those living under our Constitution that they may conduct their lives free to a reasonable extent from the prospect of totally baseless criminal charges.

### B. *The Standard of Care*

I have no occasion in this dissent to attempt a precise articulation of the "broad outer limit" that the fourth and fifth amendments impose. Surely an investigator assigned to identify a call's recipient must exercise some care. Here a jury could reasonably conclude that Arwine exercised virtually none. Surely an agent who receives another agent's reports and testifies before a grand jury, knowing his testimony will result in indictment and arrest, must make some attempt to conform his testimony to the information provided him. To the extent the testifying agent draws conclusions rather than relates raw data others have given him, he must make some at-

tempt to derive those conclusions reliably. Here a jury could reasonably conclude, for all that appears in this incomplete record, that Kinne failed to make even minimal gestures in these directions. Kinne's testimony may have inaccurately reproduced Arwine's reports or incorporated Kinne's own baseless conclusions. In sum, whatever the precise location of the constitutional boundary, a jury could conclude that agents Arwine and Kinne have transgressed it. Summary judgment was inappropriate.

My conclusion remains firm despite the complaint's single use of the word "negligence." Admittedly, one approach to measuring the agents' fourth and fifth amendment duty would be to press into service traditional tort concepts. We could ask whether the Constitution proscribes conduct that is negligent, grossly negligent, reckless, or intentional. Before we rush into a debate over which standard to adopt, however, a preliminary observation deserves emphasis.

Any attempt to give universal constitutional effect to a single standard would be misguided. Varying constitutional provisions serve distinct purposes. There is no reason to insist on uniformity in the standards those provisions impose upon government officials. We know, for example, that a prison doctor's delivery of medical care transgresses the eighth amendment only if it constitutes "deliberate indifference." *Gamble v. Estelle*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1977). On the other hand, a prosecutor runs afoul of constitutional dictates when his failure to disclose sufficiently probative exculpatory evidence constitutes mere negligence. *See, e. g., United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor"). I see no reason to attempt to catalog the various constitutional rights in terms of whether mere negligence would establish a violation. The important point is that the standards would vary.

I therefore find little value in an abstract discussion of whether governmental negligence, or gross negligence, or recklessness, is unconstitutional across the board. The proper approach is to assess the values underlying a particular constitutional provision and the governmental interests that prevent giving unbridled recognition to those values. The problem is then to devise a constitutional standard that best accommodates the individual and governmental interests. The government should always afford due care; the issue is how much care is due in the various settings.

Applying this approach to the case at bar, I perceive no obvious reason why the Constitution should allow an agent to fail to act as a reasonable person.[16] Others on the court, however, apparently believe that FBI negligence should escape constitutional condemnation. Whatever the proper resolution of that issue, surely some level of FBI recklessness contravenes the appropriate standard. Resolving factual disputes in appellant's favor, this incomplete record discloses sufficient recklessness to require the case to go forward. And the complaint's isolated use of the word "negligence" surely does not compel a different result.[17]

## C. *Relevance of the Indictment*

The plurality ignores the constitutional standards that I have described. Not once adverting to the possibility that the agents' pre-indictment conduct might have contravened the Constitution, the plurality narrows its focus to the precise instant of arrest. The plurality reasons that the arrest itself could not have been illegal because the grand jury mandated it. Once a grand jury has returned an indictment, the theory runs, arrest is proper. The plurality apparently embraces this broad principle even when agents have post-indictment information suggesting innocence, information that was not available to the grand jury.

The cases upon which the plurality relies for its unbounded deference to grand juries all arose in a different context and are completely inapplicable here. Those cases establish only that a grand jury indictment is a sufficient determination of probable cause to require the indicted person to stand trial. The court need not consider an indicted defendant's pretrial motion to dismiss a prosecution for lack of probable cause. Solely for that purpose, the indictment conclusively establishes probable cause.

The weakness of the plurality's precedential base is demonstrated by the first case upon which it relies, *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). Procedural due process fans will immediately recognize *Mitchell* as part of the progeny of *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). *Mitchell* rejected a procedural due process attack on a Louisiana procedure allowing a lien creditor to obtain judicial sequestration of the debtor's property prior to a hearing. Holding that under the circumstances the opportunity for a post-seizure hearing satisfied due process, the Court cited *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). *Ewing* had approved the multiple seizure of misbranded drugs despite the absence of a pre-seizure hearing. In *Mitchell* the Court quoted *Ewing*: "It is sufficient, where only property rights are

---

16. We might balk at holding a negligent agent personally liable in most instances, but the agent's good faith defense will assure the proper resolution of this problem. Whether the agent should be personally liable for damages is an altogether separate issue from whether the conduct is constitutional. I believe the improper commingling of these separate issues is *the source of efforts to determine*, across the board, whether "mere negligence" can be unconstitutional.

17. The complaint adverted to "negligence" only once, in a paragraph pleading proximate causation. Especially in view of the facts developed in the early discovery stages, this clearly is not a "mere negligence" case. To hold otherwise would be to revert to the worst days of common law pleading, when one slip of a lawyer's pen would deprive the client of his day in court.

concerned, that there is at some stage an opportunity for a hearing and a judicial determination." *Mitchell, supra,* 416 U.S. at 612, 94 S.Ct. at 1902, quoting *Ewing, supra,* 339 U.S. at 599, 70 S.Ct. 870. In passing, the Court appended the footnote upon which the plurality here relies so heavily:

Conceding that the multiple seizure might cause irreparable damage to a business, the Court responded:

"The impact of the initiation of judicial proceedings is often serious. Take the case of the grand jury. It returns an indictment against a man without a hearing. It does not determine his guilt; it only determines whether there is probable cause to believe he is guilty. But that determination is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial. See *Beavers v. Henkel,* 194 U.S. 73, 85, 24 S.Ct. 605, 48 L.Ed. 882; *Ex parte United States,* 287 U.S. 241, 250, 53 S.Ct. 129, 77 L.Ed. 283. The impact of an indictment is on the reputation or liberty of a man. The same is true where a prosecutor files an information charging violations of the law. The harm to property and business can also be incalculable by the mere institution of proceedings. Yet it has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised." 339 U.S., at 599, 70 S.Ct. 870, 94 L.Ed. 1088.

*Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 612 n.11, 94 S.Ct. 1895, 1902, 40 L.Ed.2d 406 (1974).

The plurality accords undue significance to the *Mitchell* footnote. The Court did say that the indictment was "conclusive on the issue of probable cause." But in the very next sentence the Court made clear that that "conclusiveness" related only to the issue of whether the defendant could be held for trial, not to collateral proceedings dealing with separate claims.[18] The entire footnote relates to the sentence in text to which it was appended: "It is sufficient . . . that there is at some stage an *opportunity for a hearing and a judicial determination.*" (Emphasis added). In the case at bar, of course, the plurality would deprive appellant Rodriguez of any opportunity at all for a hearing and judicial determination.

*Mitchell* is not the only case upon which the plurality places undue reliance. The other cases deal with the same irrelevant problem, the sufficiency of an indictment to require a defendant to stand trial despite assertions of innocence.[19] Not one of the

---

**18.** Moreover, the Court also noted that "[t]he same is true where a prosecutor files an information . . . ." Surely the plurality would not suggest that the filing of an information would absolve FBI agents from all responsibility for otherwise unconstitutional conduct.

**19.** In addition to *Mitchell* and *Ewing* (the procedural due process cases having nothing to do with indictments or grand juries or probable cause, let alone subsequent civil proceedings to redress substantive constitutional deprivations), the plurality cites four cases in support of its conclusion that indictment conclusively establishes probable cause. *See ante,* at 1191 n.22. None deal in any way with separate civil proceedings brought to enforce constitutional rights. In *Ex parte United States,* 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932) the Court held that the district court to which an indictment is returned must issue an arrest warrant; it has no discretion to refuse. The Court carefully

distinguished a line of cases allowing district courts to go behind indictments. Those cases arose under the removal statute (then codified as 18 U.S.C. § 591; R.S. § 1014; ch. 252, § 19, 29 Stat. 184 (1896), *as amended by* ch. 814, 31 Stat. 956 (1901); now substantially amended and codified as 18 U.S.C. § 3041), which governed removal of a federal arrestee from one state to stand trial in another. The removal cases made clear that the removing court could reassess probable cause despite the earlier indictment; the indictment was not conclusive. The Court explained the distinction in this language:

In cases arising under the removal statute, the indictment is produced and considered, not as a basic pleading, but merely as evidence establishing or tending to establish the commission of the offense and which may or may not settle the question of probable cause. In the trial court to which the indict-

plurality's cases indicates that the grand jury determination should carry any weight at all in a separate proceeding unconcerned with the government's authority to bring the defendant to trial.

The significance of that distinction is readily apparent. It is one thing to give effect to an ex parte determination for the purpose of initiating contested, adversarial adjudication of the underlying dispute. It is quite another thing, however, to assign res judicata effect to an ex parte decision by lay persons. The plurality has, in effect, precluded Ms. Rodriguez from litigating her constitutional claim because the disputed issues were resolved unfavorably to her in an action to which she was not a party, at which her adversary presided, and at which the decision makers were lay persons who had before them only inaccurate and incomplete information.

So far as I am aware, no one has ever before taken such a position. Traditional

res judicata law of course establishes that a decision is binding only against parties and their privies. Surely even the plurality would concede that the grand jury determination can have no res judicata or collateral estoppel effect on Rodriguez. To bind her on the basis of a proceeding to which she was not a party would raise significant procedural due process problems and would, at the very least, be eminently unfair.

I submit that what the plurality has done is precisely that. Its insistence that the grand jury determination establishes probable cause once and for all constitutes, in effect, an unwarranted extension of the res judicata concept. Moreover, the plurality's approach is inconsistent with long-standing common law principles of malicious prosecution. It has never been the case that an indictment conclusively establishes probable cause for purposes of a subsequent action based on wrongful prosecution and arrest. Indeed, under some circumstances the fact of indictment provides a necessary prereq-

---

ment has been returned it is "the very foundation of the charge." [citations omitted].

It reasonably cannot be doubted that, *in the court to which the indictment is returned,* the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause *for the purpose of holding the accused to answer.*

287 U.S. at 249–50, 53 S.Ct. at 131 (emphasis added).

On this basis the Court issued a writ of mandamus compelling the district court to issue an arrest warrant.

The other Supreme Court decision upon which the plurality relies is a removal case, *United States ex rel. Kassin v. Mulligan,* 295 U.S. 396, 55 S.Ct. 781, 79 L.Ed. 1501 (1935). Far from supporting the plurality's position, *Kassin* refutes it. In *Kassin* the Court refused to allow an indictee to be brought to trial, holding that "[t]he indictment is not conclusive" and that the indictee had shown in his removal hearing that probable cause did not exist. 295 U.S. at 402, 55 S.Ct. 781. *See also Fetters v. United States,* 283 U.S. 638, 51 S.Ct. 596, 75 L.Ed. 1321 (1931); *Beavers v. Henkel,* 194 U.S. 73, 24 S.Ct. 605, 48 L.Ed.2d 882 (1904).

The opportunity to contest probable cause in the removal hearing was not a matter of constitutional right—I readily concede that those arrested outside the state of indictment could be brought to trial on the basis of the indictment alone, just as those arrested within the state

can be—and the standards have now been changed. Fed.R.Crim.P. 40(b)(3)(A) now provides that the indictment standing alone allows removal of the indictee. The final two cases upon which the plurality relies merely recognize this fact.

*United States v. Green,* 162 U.S.App.D.C. 402, 499 F.2d 538 (1974) held that in removal proceedings a district court cannot consider the arrestee's claim of prejudicial delay in the institution of the underlying criminal proceedings. A district court must order removal solely on the basis of the indictment. The plurality's final case, *United States v. Perkins,* 140 U.S. App.D.C. 76, 433 F.2d 1182 (1970) held only that, especially in view of the limited issues open at a removal proceeding, the district court's order holding a defendant competent to participate in such a hearing was not appealable.

Thus the cases upon which the plurality relies establish only that an indictment is conclusive on the probable cause issue solely "for the purpose of holding the accused to answer." *Ex parte United States, supra,* 287 U.S. at 250, 53 S.Ct. at 131. Those cases provide no support for the plurality's sweeping assertion that the indictment is conclusive for all times and for all purposes. Moreover, those cases also make clear that Congress could change that result by providing a procedure for reassessing probable cause. *United States ex rel. Kassin v. Mulligan, supra.* Here, of course, Congress has provided a procedure for litigating probable cause. 28 U.S.C. § 1331.

uisite—not a bar—to a malicious prosecution action. Such an action lies only when the criminal proceeding has been commenced. "[W]here prosecution is begun by indictment . . . , it seems clear that this should be enough. . . ." W. Prosser, Handbook of the Law of Torts 836 (4th ed. 1971). Because a malicious prosecution action lies only when charges are brought without probable cause, see id. at 841, a grand jury indictment clearly is not a conclusive determination that probable cause exists. In numerous cases plaintiffs have been allowed to look behind grand jury determinations of probable cause. See, e. g., *Cook v. Proskey*, 138 F. 273 (2d Cir. 1905); *Dennis v. Ryan*, 65 N.Y. 385 (1875).

I believe that it is incumbent upon the plurality to explain its sharp break with these well established principles. I reject the plurality's approach because the constitutional restraints on the criminal justice system are important and because the federal courts should be available to remedy sufficiently egregious departures from the governing standards. Adversarial hearings provide a method for safeguarding cherished constitutional rights that is far superior to ex parte determinations by lay persons. Even if grand juries were not subject to well documented abuses, they would constitute an unacceptable forum for finally adjudicating constitutional claims.

Moreover, even if the plurality were correct that an indictment conclusively establishes the constitutionality of an arrest, its disposition of this case would not follow. For here we deal not solely with the arrest itself, but with a whole array of antecedent conduct. Surely *some* constitutional standard governs an agent's giving of false testimony. Here Kinne undeniably gave false testimony. Whether his conduct at that point was unconstitutional seems to me a question wholly unrelated to whether the grand jury chose to indict. The same is true of the issue of whether Arwine's investigative conduct transgressed the governing norms. Unconstitutional police conduct does not become constitutional merely because it results in indictment. To use Judge Hill's apt phrasing, the conduct of an officer who maliciously seeks an unfounded indictment does not become constitutional merely because the deceptive officer "did such a good job that the grand jury indicted." *See ante*, at 1195. (Hill, J., specially concurring).[20]

The plurality gives no reason at all for its conclusion that the Constitution sets no outer limits on FBI investigatory tactics and the FBI's giving of false testimony before a grand jury.[21] Whatever their exact scope,

---

**20.** I do not suggest the agents acted maliciously. The plurality's analysis, however, leaves no room for a distinction between malicious and non-malicious conduct. The plurality's position is rather clearly that the indictment is conclusive without regard to the underlying facts.

**21.** Two unarticulated premises may motivate the plurality. I find both unpersuasive. First, the plurality may fear that recognizing Rodriguez's claim would open the floodgates, producing another deluge of prisoner actions. But if the perceived problem is numerous meritless petitions, we could easily establish limits that would provide an effective solution. Plaintiffs could be required to show the favorable disposition of the charges and the lack of probable cause for their institution. They could even be required to establish their acknowledged innocence of all charges. Rodriguez easily satisfies these criteria; frivolous claimants could not. Certainly few plaintiffs would come forward who could establish, as Rodriguez has, that they were totally and concededly innocent and

that they were indicted and arrested for no cause whatsoever. If a flood of plaintiffs could make that showing, then it is time to board the ark, for surely the situation calls for a drastic sanction and a new beginning.

The second unarticulated factor that may motivate the plurality is the fear that grand jury secrecy will be imperiled. This concern, too, is insubstantial. Although in the case at bar it might become appropriate to bring forth agent Kinne's grand jury testimony, the district court could exercise careful supervision of the process. There is no reason to afford continued secrecy to Kinne's undeniably false testimony. Grand jury secrecy must of course yield in any prosecution for perjury before that body. While no one contends Kinne's testimony was deliberately false and thus perjurious, I see no reason to assign grand jury secrecy a determinative role when a plaintiff demonstrates that she was totally innocent and that she was indicted on the basis of an FBI agent's undeniably false testimony. If, as the case develops, substantial interests in grand jury

constitutional standards do have a sphere of operation that encompasses FBI investigations intended to bring to bear the state's awesome criminal justice scheme. Among the primary functions of the Bill of Rights is to assure that when the government undertakes to interfere drastically with someone's life, it does so for a reason. Here the government leveled a devastating onslaught at Ms. Rodriguez. To say that the Constitution does not even address the manner in which the government agents mounted their assault is to ignore the fundamental values that underlie that document. People ought not be arrested for no reason. The government should structure its investigative system and its scheme for delivering information to grand juries in a manner that minimizes baseless arrests. Surely the Constitution embodies these values. The Constitution does impose a duty upon government investigators.

The grand jury does not have any power of constitutional repeal, nor is it vested with the power to administer the rites of absolution for constitutional sins. Our law enforcement officers deserve our assistance and respect in the performance of their duties, but the grand jury cannot forgive their derelictions. The grand jury may have majestic splendor and even can have some aspects of an autocratic body, but it has never been suggested that it is supraconstitutional. No inscription above the grand jury room announces that those who suffer harm herein may abandon hope for justice from those who enter here. It is a sacred precinct, but it resides within the constitutional enclave. An indictment cannot metamorphose a constitutional error by any purging powers of a grand jury. The grand jury does not have the powers of an alchemist, changing the gold of constitutional rights into the brass of constitutional deprivation. Grand juries are charging

bodies, but it has never been suggested that they are vested with the ability to discharge a person from violating the constitution.

The grand jury simply does not concern itself with the methods by which evidence is gathered to be presented to it. Yet the plurality would allow the grand jury to immunize, however grave the error might be, just by returning an indictment. The plurality would monumentalize this act of indicting, attributing to it such effect as to abrogate the constitutional right of people to be free of unconstitutional molestations. I must disagree. Grand juries have many powers, but I have never thought exorcism to be among them. Indictment or no indictment, Rodriquez has squarely alleged a constitutional violation.

## IV. Cause of Action for Damages

Having found a constitutional violation, the next question is whether damages are an available remedy. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) provides the answer. There the Court held that damages against the offending officials are an available remedy for fourth amendment violations. The violation in the case at bar involves both the fourth and fifth amendments.

Even if this case involved no fourth amendment violation, *Bivens* would provide a remedy. The plurality acknowledges that the circuits have uniformly concluded that *Bivens* applies to the fifth amendment as well as to the fourth. *Ante*, at 1192 n.24. Thus, whether this case is conceived as a fourth or fifth amendment action, *Bivens* provides a damages remedy.[22]

## V. Good Faith Defense

My conclusion that the Constitution and *Bivens* extend to FBI investigatory tactics

---

secrecy appear imperiled, the district court could take whatever steps are necessary to accommodate the competing interests. At this stage, however, grand jury secrecy provides no basis for aborting Rodriguez's claim.

**22.** The plurality unjustifiably refuses to consider the fifth amendment, attaching undue sig-

nificance to appellant's labeling of the legal arguments she clearly advances. No one has referred to "federal common law," but the plurality nonetheless addresses that fashionable doctrine. It should likewise address the clearly-implicated fifth amendment due process clause.

does not, of course, subject helpless FBI agents to the prospect of uncontrollable damages judgments. Agents remain free to assert the good faith defense. But on the facts here, agents Arwine and Kinne have failed to demonstrate sufficient good faith to warrant summary judgment.

In his concurrence, Judge Hill seems to articulate the governing standard as whether the agents acted "maliciously or in bad faith." This formulation fails to accord with Supreme Court pronouncements. The leading case is *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).[23] The Court squarely rejected the notion that an official's "subjective" motivation could, without more, provide a valid defense. The Court held that the proper standard contains an "objective" as well as a "subjective" element. 420 U.S. at 321, 95 S.Ct. at 1000, 43 L.Ed.2d at 225. Officers are immune from liability for "action taken in the good-faith fulfillment of their responsibilities *and within the bounds of reason*." 420 U.S. at 321, 95 S.Ct. at 1000, 43 L.Ed.2d at 224 (emphasis added). But an officer "is not immune from liability for damages . . . if he knew *or reasonably should have known* that the action he took within his sphere of official responsibility would violate the [plaintiff's] constitutional rights." 420 U.S. at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225 (emphasis added).[24]. *See also Bivens v. Six Unknown Named Agents*, 456 F.2d 1339, 1348 (2d Cir. 1972) (on remand) (to establish defense "the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable").

In the case at bar we confront a classic jury question whether agents Arwine and Kinne acted in good faith under the Supreme Court's test. Arwine's assignment was to identify the person who received the October 5, 1971 call to 935–9024. At trial he would apparently contend that a telephone company employee said that that was the unlisted phone of Margaret S. Rodriguez of 3420 Grace Street. Arwine would say he learned that Rodriguez had owned a beauty salon for many years and had never been arrested. He would add that Tampa Police Sergeant Fairbanks said that he previously investigated a Margaret Rodriguez who had formerly owned a beauty salon. On that basis, Arwine would apparently contend, he reasonably concluded Margaret S. Rodriguez was the person who received the call at 935–9024.

For all that I can glean from this record, the response would be devastating. The phone company's records did not contain the name "Margaret S. Rodriguez" and did not indicate that she lived at 3420 Grace Street. In any event the company's records were warehoused across town from the building Arwine claimed he contacted, and the records were thus inaccessible to any employee with whom Arwine could have spoken. And telephone company policy was to release information on unlisted numbers only in response to subpoenas or in emergency situations. The jury, on this showing, could reasonably choose to disbelieve this aspect of Arwine's story.

The jury would also confront Arwine's inconsistent statements with respect to

---

**23.** *Wood* arose under 42 U.S.C. § 1983, as did the other leading Supreme Court decisions on the good faith defense. *See, e. g., Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The relevant good faith standards, however, are, at least for our purposes here, essentially the same.

**24.** The statements in *Wood* related specifically to school board members, but the standards have been applied more generally. *See O'Connor v. Donaldson*, 422 U.S. 563, 576–577, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407–408 (1975) (applying *Wood* to mental health institu-

tion superintendent; reiterating that official is liable if he "reasonably should have known" his actions were unconstitutional); *Davis v. Passman*, 544 F.2d 865, 881 n. 27, *rehearing en banc granted*, 553 F.2d 506 (5th Cir. 1977) (collecting cases). *See also Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Any variation in standards based upon the amount of discretion that a particular official must exercise would cut in Rodriguez's favor. Ordinarily, school board members must exercise more, not less, discretion than FBI investigators.

whether he dialed 935–9024 to attempt "voice identification." His original story was apparently that he did.[25] He later asserted that he utilized a directory to determine an unlisted number and then dialed the listed number to attempt voice identification. He concedes, however, that he never listened to the tape of the suspect's voice. Thus whatever number he called (or did not call), he could not have attempted to match the voices. These inconsistencies in Arwine's explanations cast considerable doubt on his good faith.

Even taking the facts in the light most favorable to Arwine—which is of course not the appropriate standard in assessing Arwine's own motion for summary judgment—a jury question is present in regard to good faith. Arwine never attempted to resolve the conflicting descriptions of the suspect as "Barbara" or "Margo". He never dialed 935–9024 to determine whether Margaret S. Rodriguez answered the phone or could be reached there. He never listened to the tape in order to match the voices. He never asked Sergeant Fairbanks to check his records to verify the identity of the person he had previously investigated.

Surely a jury could reasonably conclude that these actions failed to come "within the bounds of reason." *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). A jury could conclude that Arwine "reasonably should have known" that he had wholly failed to assemble a suggestion of probable cause and that forwarding someone's name for indictment on the basis of so sloppy an investigation infringed constitutional rights. *See* 420 U.S. at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225. It is at least a jury question whether a special agent of the FBI could reasonably believe that he complied with constitutional prescriptions when he exhibited so little concern for the possibility that his actions would bring about the indictment and arrest of a totally innocent person.

The same is true of Agent Kinne. Our record presents a less compelling case

against Kinne, but it does not exclude the possibility that his good faith will constitute a jury question. For all we know, Kinne's grand jury testimony was the sole basis for Rodriguez's indictment. Perhaps Kinne testified accurately that the FBI had conducted an incompetent investigation and that there was little reason to believe Margaret S. Rodriguez had committed any crime. But the grand jury did return an indictment, and I find it much more likely that Kinne's testimony distorted the character of the investigation or drew unjustified conclusions with respect to Rodriguez's role in the gambling operation. Did Kinne state positively that the call's recipient was Margaret S. Rodriguez? If so, his reckless manner of drawing conclusions from inadequate data might not fall within the bounds of reason required to establish a good faith defense. Did Kinne testify that an agent had called 935–9024 and compared Margaret S. Rodriguez's voice to that on the October 5, 1971 recording? If so, did Kinne have an adequate reason to believe that that testimony was true? Did Kinne have an adequate reason to believe the October 5 call's recipient was involved in bookmaking, or did he draw unwarranted conclusions and relate them to the grand jury without sufficient qualification? Further discovery would produce answers to some of these questions. Without answers summary judgment for Kinne is inappropriate. If Kinne accurately related information Arwine provided him and if Kinne did not himself draw unjustifiable conclusions, he need only establish those facts. At this point he has not done so.

Moreover, Kinne's *post*-indictment conduct may also have exceeded the bounds of reason. Two days after the grand jury returned the indictment, but before Rodriguez was arrested, Kinne spoke to Gene Bennett, who had been discussed by the parties to the October 5 call. Bennett denied knowing any "Margo" who was a bookmaker. Had Kinne shown any concern at all for avoiding baseless charges against

---

**25.** That position, at least, was espoused by someone in a justice department memorandum

that has not yet seen the light of day. *See* note 9 *supra*.

innocent people, he could have pursued the conversation with Bennett one step further. He could have asked Bennett whether he knew anyone named "Margo." The answer to that question would have led Kinne to the real Margo. Margaret S. Rodriguez would have avoided arrest, over a year under indictment, and the attendant humiliation, attorney fees, and loss of business goodwill. Kinne's callous disregard of a lead suggesting Rodriguez's innocence presents a jury question in regard to whether Kinne "reasonably should have known" his actions transgressed constitutional limitations.[26]

I do not wish to add to the verbal ennui by reciting the bromide of numberless cases that summary judgment should be reserved for those instances when the relevant facts are not in dispute. No one reading this record could deny that the digital miscalculations and nomenclatural confusions were reproachful. Negligence can so accumulate as to disprove good faith. Government agents are entitled to some immunity and protection in the prosecution of their task, but they should not be permitted to run afoul of the Constitution without some justification based on acceptable norms and standards. Even a badge should have some limitations on its authority. The populace should respect officers of the law, but officers of the law should respect the constitutional rights of the populace. There are two parts to this equation, and I would give each equal status. A badge does not entitle one to defile the Constitution. The immunity of governmental agents must not be automatic and self-anointed.

All of the facts are not yet clear. What is clear is that the FBI hopelessly bungled its investigation and that the agents, in their extreme recklessness, showed little concern for the possibility that their net was gathering innocent people along with the guilty. Something was rotten in Tampa. The constitutional restraints on the criminal justice system do not tolerate such unjustified behavior. The agents' good faith is a jury question.[27] I respectfully dissent.[28]

BROWN, Chief Judge, dissenting:

I concur in Judge Goldberg's dissent, except that in part V, Good Faith Defense I do not embrace the extended factual analysis and the characterizations placed upon some of the supposed responses by the agents, some of which come to the brink of declarations as a matter of law. I predict that this case will come back to us and hence the Trial Court and perhaps another appeal. I wish to leave myself free to determine the issue without the sometime dramatic embellishments.

---

**26.** Even if the plurality were correct that a grand jury indictment purges all unconstitutional antecedent conduct, Kinne's post-indictment behavior would provide a basis for this action. To hold otherwise, the plurality implicitly adopts the principle that the Constitution leaves an officer free to disregard evidence of innocence so long as the innocent person is under indictment.

**27.** I agree that agents Ritchey, Sosbee, Santoiana and Batley have a valid good faith defense, even resolving factual disputes against them. I concur in affirmance with respect to them.

**28.** Perhaps the plurality's clearest error is its conclusion that the complaint should have been dismissed for want of jurisdiction. When six of this court's thirteen judges vote to send a claim to the jury, I view it as difficult to characterize the claim as frivolous. The plurality's contrary conclusion clearly runs afoul of *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1947).